Max MINTZ and Hilda Mintz, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

Louis MINTZ and Maybelle Mintz, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

Morris MINTZ and Evelyn Mintz, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

Nos. 6, 7, 8, Dockets 25938–25940.

United States Court of Appeals Second Circuit.

Argued Oct. 7, 1960.

Decided Nov. 17, 1960.

Lawrence J. Podell, Malverne, N. Y., for petitioners.

David O. Walter, Dept. of Justice, Washington, D. C. (Howard A. Heffron, Acting Asst. Atty. Gen., Lee A. Jackson, Harry Baum, Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before HINCKS, WATERMAN and MOORE, Circuit Judges.

LEONARD P. MOORE, Circuit Judge.

Petitioners [1] seek a reversal of decisions of the Tax Court (32 T.C. 723) which held that the gain which they realized on the receipt of cash distributed by, and on the sale of their stock in, Kingsway Development, Inc. (Kingsway), a corporation owning three apartment houses built under Federal Housing Administration mortgage guarantees, was taxable as ordinary income rather than as capital gain within the purview of the 1950 amendment to Section 117 of the Capital Gains Section of the Internal Revenue Code of 1939, ch. 994, 64 Stat. 906, 26 U.S.C.A. § 117, the "collapsible corporation" section.

After providing that gain from the sale or exchange of stock of a collapsible corporation shall be considered as gain from the sale or exchange of property which is not a capital asset, Section 117 (m), entitled "Collapsible Corporations," defines a collapsible corporation as—

"(A) * * * a corporation formed or availed of principally for the manufacture, construction, or production of property * * * with a view to—

"(i) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, prior to the realization by the corporation * * * of a substantial part of the net income to be derived from such property, and

"(ii) the realization by such shareholders of gain attributable to such property."

Petitioners had for years been in the real estate development business. In 1948, they, together with Monroe Markowitz, a brother-in-law, either directly or through a closely held corporation controlled by them, acquired three parcels of land at a cost of $44,567.96.

Hoping to mortgage out, that is, to obtain a loan that would exceed the cost of construction, Louis Mintz and Markowitz, as co-sponsors on behalf of the yet not formed Kingsway, applied under Section 608 of the National Housing Act for $1,125,000 in F.H.A. mortgage insurance, an amount based on estimated costs which included substantial builder's and architect's fees which petitioners did not intend to pay in full. They received a tentative commitment. Thereafter, on February 14, 1949, petitioners and Markowitz formed Kingsway and later conveyed the three plots of land to the corporation in return for stock. The land was entered in the Kingsway books at cost, namely, $44,567.96.

On April 4, 1949, Louis Mintz submitted a revised application to F.H.A. requesting an increase in the mortgage guarantee to $1,283,000, pursuant to which F.H.A. increased its commitment to $1,253,800. On August 11, 1949, a first mortgage loan was agreed to by the Lincoln Savings Bank of Brooklyn (Lincoln) and on the same day Kingsway entered into a construction contract with Marmintz Homes, Inc. (a corporation wholly owned by petitioners and Markowitz) to build the project for $1,182,001. Work was commenced on the apartment buildings and in "November or December" of 1949 petitioners' accountant prepared a report showing clearly that the F.H.A. guaranteed mortgage loan proceeds would exceed construction costs.

During the first six months of 1950 because of differences of opinion concerning rentals and management, the relationship between the Mintz brothers and Markowitz became increasingly strained. Finally, in July, 1950, Louis who apparently was the spokesman and tactician for the brothers determined that a separation between himself and his brothers, on the one hand and Markowitz, on the other, not only with respect to Kingsway stock but also with respect to other properties which they owned together, would be desirable.

Louis telephoned a real estate broker concerning the Kingsway stock and put upon it a price, after all available cash was withdrawn from the corporation, of $100,000.

On September 1, 1950, the F.H.A. conducted a final inspection and found that although most of the project was acceptably completed, more remained to be done. The final payment was made on September 25, 1950, but a small sum was deposited in escrow to insure that the landscaping would be completed. On this date the Kingsway board of directors met. The mortgage proceeds had, as hoped for, exceeded the amount actually expended in construction. The buildings and equipment were revalued in Kingsway's books from the $1,037,-698.14 [2] cost basis to $1,300,000 in order to create a revaluation surplus and three days later a distribution of $216,300 from surplus was made to petitioners and Markowitz. On their 1950 returns petitioners reported these distributions as capital gain. On the same day (September 28, 1950) petitioners and Markowitz sold their stock for $102,905 pursuant to a contract dated July 31, 1950. This gain they also reported as capital gain.

Kingsway received a $47,017.50 mortgage premium from the mortgagee, Lincoln. It was only after a revenue agent challenged Kingsway's income tax returns that they were adjusted to reflect the mortgage premium funds as ordinary income.

■ Section 117(m) of the 1939 Internal Revenue Code, as its somewhat similar counterpart in the 1954 Code at 26 U.S.C.A. § 341, employs the "collapsible corporation" appellation. This somewhat misleading term was probably selected by the draftsman because the basic type of financial scheme at which the section was aimed often involved the use of temporary corporations which were dissolved and their profits attributable to construction of the principal corporate asset distributed. That the corporation be liquidated and thus "collapse," however, is not a prerequisite to the application of the statute. Section 117(m) applies, although the corporation proceeds on its way, without collapse, as it appears Kingsway is doing, if taxpayers realize financial benefits which the section dictates are to be considered ordinary income instead of capital gains. See Burge v. Commissioner, 4 Cir., 1958, 253 F.2d 765, 767; Glickman v. Commissioner, 2 Cir., 1958, 256 F.2d 108, 110; Spangler v. Commissioner, 4 Cir., 1960, 278 F.2d 665, 672.

The statute was enacted to stop taxpayers' alchemy by which they sought to convert ordinary income into capital gains by means of using corporations formed for this purpose. Both the House and Senate Committee reports described a collapsible corporation as "a device whereby one or more individuals attempt to convert profits from their participation in a project from income taxable at ordinary rates to long-term capital gain taxable only at a rate of 25 per cent." H.R.Rep. No. 2319, 81st Cong. 2d Sess. 96; Sen.Rep. No. 2375, 81st Cong. 2d Sess. 88.

The purpose of the statute was to provide a basis for the Internal Revenue Service to attack schemes employed in certain industries with great frequency, namely, the organization of separate corporations for each particular enterprise. The stock would be sold before a substantial amount of the income which could be expected from the main corporate asset was realized. Frequently, the gain was partly accounted for by the fact that the stockholders had contributed their services without any, or at a nominal, charge and partly by the fact that the stock sale had the effect of transferring ownership of the income producing asset before a substantial amount of the income to be derived therefrom had been realized. If taxpayers' hopes of receiving capital gain treatment through the stock sale vehicle were realized, income

---

**2.** Cost of construction was later revised to $1,045,845 pursuant to an adjustment made by a revenue agent and agreed to by Kingsway.

that normally would be taxed at ordinary income rates, once to the corporation and again upon distribution to the stockholders, would be taxed at the lower capital gains rate.

Congressional hearings disclosed schemes where seemingly excessive mortgage applications were made at a time when the applicant had knowledge that the actual building cost would probably be less than the mortgage funds applied for. In the absence of Section 117(m) the profits might have been held to be capital gains instead of ordinary income. See Commissioner v. Gross, 2 Cir., 1956, 236 F.2d 612.

The only genuine issues raised by petitioners with regard to the decision of the Tax Court are: (1) whether there is evidence from which the Court could find that Kingsway was availed of by petitioners "with a view to—the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, prior to the realization by the corporation * * * constructing * * * the property of a substantial part of the net income to be derived from such property" (Section 117(m) (2) (A) (i)); (2) whether the distribution and sale took place prior to the realization of a substantial part of the net income to be derived from the property (Section 117 (m) (2) (A) (i)); (3) whether more than 70 per cent of the gain to petitioners is attributable to the constructed property (Section 117(m) (3) (B)). If these three questions are answered in the affirmative and there are no special circumstances which justify not calling Kingsway a collapsible corporation (Treasury Regulations § 29.17–11(b)), the determination of the Tax Court must be affirmed.

■ 1. Petitioners impliedly argue that in Section 117(m) the word "principally" modifies "with a view to," and that therefore the prohibited sale has to be a principal objective in forming or availing of the corporation for construction in order for the Section to apply. This strained and artificial construction has been rejected by this court in Weil v. Commissioner, 2 Cir., 1958, 252 F.2d 805, 806, the court saying, "(T)he corporation may be treated as collapsible if 'manufacture, construction, or production' was a principal corporate activity even if the 'view to' collapse was not the principal corporate objective when the corporation was 'formed or availed of * * *'." See also Burge v. Commissioner, supra, 253 F.2d at page 768.

■ Petitioners next argue that the finding of the Tax Court that the requisite view to distribute existed during construction is not supported by the facts and they infer that if the view is not born until after the completion of construction the section would not apply. Whether when the view to distribute arises after completion of construction the gain on distribution would be treated as ordinary income need not be decided because the findings of the Tax Court here are clearly supported by the evidence. See Spangler v. Commissioner, supra, 278 F.2d at page 671.

Exactly when the view arose is always difficult to determine, but the undisputed basic facts support the inference that the prohibited view existed as early as April 4, 1949, when petitioners filed a revised F.H.A. application in the face of the probability that the sum already promised would be more than sufficient to meet construction expenses. Amongst other events which would support such findings are: (1) in "November or December" of 1949, petitioners received reports from their accountant which assured them that the mortgage proceeds would exceed expenditures by a safe margin, yet they made no effort to reduce the size of the mortgage in order to avoid interest expense though petitioner Louis Mintz's testimony repeatedly evidences his concern about burdening any project with unnecessary charges; (2) on March 1, 1949, petitioners reduced rents of the first of the three buildings completed in order to aid in quick rental, a decision which might indicate an effort to fill the rent roll to facilitate a sale;

(3) Louis Mintz as spokesman for petitioners telephoned a real estate broker and "listed" the Kingsway stock with him; and (4) on July 31, 1950 the contract of sale was signed.

The Tax Court correctly relied on this Court's decision in Glickman v. Commissioner, supra (a case most similar on its facts) in determining that whichever of the various times the sale or distribution might be said to have been recognized as a substantial possibility by petitioners, the view to sale or distribution before a substantial amount of the income to be derived from the property was realized arose before completion of construction. See also Weil v. Commissioner, 1957, 28 T.C. 809, 815, affirmed 2 Cir., 1958, 252 F.2d 805; Sorin v. Commissioner, 2 Cir., 1959, 271 F.2d 741.

■ 2. Petitioners further contend that the distribution and sale did not, as the Tax Court found, take place prior to the realization of a substantial part of the taxable income to be derived from the property. This argument is based on the fact that in 1950, $12,868.39 taxable income was earned due to the mortgage premium[3] of $47,017.50, whereas in most of the years since 1950 Kingsway has lost money. In Sidney v. Commissioner, 2 Cir., 1960, 273 F.2d 928, 931, it was said that the mortgage premium, although net income of the corporation, was not "net income to be derived from such property" for purposes of determining whether within the meaning of Section 117(m) (2) (A) (i) a substantial part of the income to be derived from the constructed property had been realized.

Furthermore, a substantial amount of the income to be derived from newly built apartment buildings would not be realized within the first year or two after completion of construction. Even in this era of manifold taxes, credulity cannot be so taxed as to permit a belief that petitioners undertook this enterprise for the purpose of enjoying losses for the thirty-two years and seven months the mortgage was to run or for the purpose of selling the property on a prospectus of such a gloomy future. Thus, there was no error in the Tax Court's finding that a substantial part of the income to be derived from the property had not been realized at the time of the sale and distribution.[4]

3. A third argument advanced by petitioners is that they are not subject to the provisions of Section 117(m) (1) and (2) because of the escape clause provided by Section 117(m) (3):

"(B) this subsection [§ 117(m)] shall not apply to the gain recognized during a taxable year unless more than 70 per centum of such gain is attributable to the property so manufactured, constructed, or produced."

■ Petitioners claim that the availability of cash for distribution was attributable not to the property constructed but to the increase of the fair market value of the Kingsway tract over cost and to the proceeds of the F.H.A. mortgage which exceeded the cost of constructing the property by almost exactly the amount of the distribution which the Commissioner attempts to tax as ordi-

3. A mortgage premium is a sum paid to a mortgagor by an F.H.A. guaranteed mortgagee during a period of easy money as a reward for the mortgagor placing his loan with the mortgagee.

4. Thus, we do not reach the problem of whether Section 117(m) is applicable where, at the time of the sale or exchange, the corporation has realized a substantial part of the net income to be derived from the property but a substantial part remains unrealized. See Kelley, 1959, 32 T.C. 135; Bittker, Federal Income Taxation of Corporations and Shareholders, 306 (1959). Similarly, although it may be that the statute requires only that the corporation be availed of for construction with a view to making the distribution prior to realization of a substantial part of the income to be derived from the property, and that it is not necessary that the distribution actually occur prior to realization of substantial income from the property, that issue need not be resolved. See Payne v. Commissioner, 5 Cir., 1959, 268 F.2d 617, 622; Spangler v. Commissioner, supra, 278 F.2d at page 671.

nary income under Section 117(m). This Court in Glickman, supra, 256 F.2d at page 111, the Fifth Circuit in Payne v. Commissioner, supra, 268 F.2d at page 621 and the Fourth Circuit in Burge v. Commissioner, supra, 253 F.2d at page 770, have rejected arguments substantially identical as imposing too narrow an interpretation on the statute. See also Bryan v. Commissioner, 4 Cir., 1960, 281 F.2d 238, 241. Treasury Regulations 111, Section 29.117-11(e), Example 1, which is in point, is in agreement with the courts and the Regulations should be sustained unless unreasonable. See, e. g., Commissioner v. South Texas Lumber Co., 1948, 333 U.S. 496, 501, 68 S.Ct. 695, 92 L.Ed. 831. While it is true that the funds distributed to petitioners were provided by the F.H.A. insured mortgage, if it had not been for the constructed property there would have been no loan. The gain as well as the cash from which a distribution could only have been made was attributable to the constructed property.

An attempt to separate the buildings from the land as sources of gain, such as is here made, was tried in Glickman, supra, and was rejected. The difference urged by petitioners is that the tract was owned by them before the formation of Kingsway and that the gain realized on the sale of the stock is attributable to the profit on the land, that is, the increase of its value between the date of purchase and the transfer of it to Kingsway. Not only is this distinction one of form only, but there is also no sufficient proof that the value of the tract, in the short time between purchase and transfer to Kingsway, increased in value from the $44,-567.96 paid for it to an amount which would account for over 30 per cent of the gain petitioners are attempting to attribute to the land independent of the construction on it.

Finally, basing their hopes upon Regulations § 29.117-11(b), petitioners argue that the internecine wars between the Mintz brothers on the one side, and Markowitz, on the other, are "compelling facts to the contrary" of a finding that the corporation was availed of for construction with a view to sale before a substantial amount of the income to be derived from the constructed property was realized. As before more fully set out, there is evidence from which the Tax Court could have found that the prohibited "view" existed before the Markowitz-Mintz battle flourished, and even if this were not so and petitioners really never wanted to sell their interest in Kingsway but desired to operate the business, it may be observed that no effort was made to buy Markowitz's interest. The record illustrates that the separation was affected with some degree of amiability, because in regard to several of the interests which were jointly held, the Mintz brothers and Markowitz were able to work out trades or cash payments to facilitate valuation.

Rather than there being certain facts which indicate an injustice to applying Section 117(m) to tax petitioners' gains at ordinary income rates, the facts clearly illustrate a common business situation which the "collapsible corporation" section was designed to cover.

A careful examination of the record reveals no errors in rulings on the admissibility of evidence prejudicial to petitioners. Other arguments advanced by petitioners have been examined and found without merit.

The decisions of the Tax Court are affirmed.