HONAKER, DRLG., INC., a corporation, Joe J. Honaker, H. C. Davis, H. S. Forbes, individually and as directors of Honaker Drlg., Inc., Ruby Lee Honaker, Jimmie Joe Honaker, a minor, and Stevie Lee Honaker, a minor, by Joe J. Honaker, their next friend and guardian of their estates, Plaintiffs,

v.

Gustave F. KOEHLER, District Director of Internal Revenue of the United States for the District of Kansas, Defendant.

No. W-1819.

United States District Court
D. Kansas.

Dec. 30, 1960.

Barton Carothers, Great Bend, Kan., and Collins, Hughes, Martin, Pringle & Schell, by Robert Martin, W. F. Schell and Laverne Morin, Wichita, Kan., for plaintiffs.

Charles K. Rice, Asst. Atty. Gen., James P. Garland, Myron C. Baum, Arthur L. Biggins, Melvyn I. Mozinski, Attys., Dept. of Justice, Washington, D. C., Wilbur G. Leonard, U. S. Atty., Topeka, Kan., and George E. Peabody, Asst. U. S. Atty., Wichita, Kan., for defendant.

ARTHUR J. STANLEY, Jr., District Judge.

This is an action to recover income taxes paid on behalf of Honaker Drlg., Inc., a liquidated corporation. The liquidated corporation appears by its last directors, Joe J. Honaker, H. C. Davis and H. S. Forbes. The individual plaintiffs were the shareholders of the corporation. The district director determined that the provisions of section 337 of the Internal Revenue Code, 26 U.S.C.A. § 337, were not available to Honaker Drlg., Inc., because it was a collapsible corporation as defined in section 341(b) of the Internal Revenue Code. 26 U.S.C.A. § 341(b). The deficiency which was assessed was paid by the individual plaintiffs as the transferees of the corporation's assets, who then brought this action for refund pursuant to 28 U.S.C.A. §§ 1340 and 1346(a) (1). The only issue in this case is whether Honaker Drlg., Inc., was a collapsible corporation as defined in section 341(b) of the Code. Judging from the reported collapsible corporation cases, the situation involved here is unique, so the facts will be set forth in some detail.

Honaker Drlg., Inc., was organized as a Kansas corporation in June, 1954. It was dissolved in April, 1956. For several years prior to the formation of the corporation, Joe J. Honaker and Ruby Lee Honaker, his wife, were engaged as partners in the oil and gas producing business. This partnership operated in a manner typical of the usual independent oil and gas producer in that it owned a drilling rig, acquired interests in oil and gas leases, drilled for oil and gas, and produced and sold oil and gas when it was found.

In December, 1953, Joe J. Honaker visited a physician for a physical examination. A tumor found on his chest was diagnosed as a malignant melanoma. This was removed by surgery in early January, 1954. This type of cancer is recognized as one of the most malignant and dangerous of all such tumors. By the time of its removal, the cancer had spread to the lymph glands under an arm, and as a result the chance of recurrence of the disease ranged from fifty to eighty percent. Upon recurrence, the malignancy can appear in any part of the body, and death can be anticipated if there is a recurrence. After the operation, Honaker was frankly advised by his physician of the seriousness of his condition and of the chances and probable consequences of a recurrence.

After the operation for the removal of the malignancy, Honaker consulted with his associates and advisors in order to obtain advice about putting his affairs in better order. He wanted to secure someone to manage his business, and to arrange his interests so that the business could continue to provide for his family in the event of his death. He also wanted to give his two minor children some interest in the business. Honaker was advised by those whom he consulted, to obtain the services of someone qualified by technical training and experience to manage an independent oil and gas producing business. It was further suggested that he form a corporation and that he give to those who were to manage the business and to

the members of his family an interest in the corporation. Following this advice, Honaker located H. C. Davis, a geologist, and arranged for him to manage the business.

Honaker Drlg., Inc., was organized on June 21, 1954. The stock in the company was owned by:

Joe J. Honaker ................15%
Ruby Lee Honaker .............15%
H. C. Davis ..................20%
H. S. Forbes .................10%
Jimmie Joe Honaker and Stevie
Lee Honaker (Honaker's minor
children) ....................40%

The two children received their stock from their parents. Forbes had been an accountant and office manager for the Honaker partnership, and was to continue in a similar position with the corporation. Davis and Forbes each received a salary in addition to their stock interests. The initial capital was $10,-000. The producing oil and gas leases which had been owned by Honaker and his wife in their partnership, together with the proven offset leases, were retained in the partnership. The unexplored and non-producing leases held by the partnership, seventeen in all, together with the drilling rig, office and field equipment were sold and transferred to the corporation. The oil and gas properties retained by the partnership were thereafter managed and operated by Honaker Drlg., Inc. All leases and development prospects thereafter acquired were taken and developed by the corporation. As an independent oil and gas company, the corporation did some contract drilling on leases in which it had no interest, but the corporation was engaged primarily in drilling properties in which it owned an interest.

During the year following the organization of the corporation, Honaker spent almost all of his time with his family. The business was managed by Davis and Forbes. These two men were successful in operating the business, and during the first year two substantial oil pools were discovered. The corporation drilled about twenty producing wells in the first year and acquired two additional rotary drilling rigs. Also, within the first year the corporation sold its Hutchinson "D" lease to Colorado Oil and Gas Corporation for $275,000, which resulted in a gain to the corporation of $258,258.99.

About a year after the formation of Honaker Drlg., Inc., Joe Honaker was approached by Heathman, another independent oil producer, who proposed a merger of the Honaker interests and his own. The proposition was that Honaker absorb the other company and operate in the United States while Heathman supervised overseas operations of the business. These merger negotiations continued for about six months, but were terminated on December 11, 1955, because of the inability of the principals to reach an agreement as to the values of the two companies. Shortly prior to the termination of the merger negotiations, Honaker was contacted by two men, James and Virtue, who inquired whether the producing oil and gas properties of Honaker Drlg., Inc., could be purchased. Honaker told them that the properties were not for sale and that he was engaged in merger negotiations. These two men made a second call while the merger talks were still in progress, at which time they asked Honaker to call them if the merger did not go through because they had a prospective purchaser who was willing to pay a good price.

When the negotiations on the possible merger terminated on December 11, 1955, Honaker, his wife, Davis and Forbes met and discussed the situation. By this time a report had been received from a firm of engineers, DeGolyer & MacNaughton. This report was an appraisal (stated in barrels of oil and cubic feet of gas) of the oil and gas reserves owned by Honaker Drlg., Inc., as of October 1, 1955, and had been obtained by Honaker for use in connection with the merger negotiations. At this meeting it was decided that Honaker should call James and tell him that the merger negotiations had terminated, and such a call was made on December 11th. The following

day, James returned the call and made an appointment to come to the office of Honaker Drlg., Inc., on December 13th to inspect the records of the properties he was interested in. On December 12th, the directors of Honaker Drlg., Inc., met

" * * * for the purpose of considering. the sale of substantially all of the producing oil and gas leases now owned by the corporation, and further, for the purpose of considering the advisability of dissolving this corporation."

At this meeting the board resolved that

" * * * the president (Joe J. Honaker) was directed to explore the possibility of selling all of the producing oil and gas leases and two non-producing leases shown in said report (DeGolyer & MacNaughton), for the purpose of raising funds to liquidate the outstanding indebtedness of the corporation."

James had revealed that he was representing San Juan Exploration Company, which was recognized by the directors of Honaker Drlg., Inc., as a large oil and gas producer. Neither the corporation nor any of its officers or stockholders had listed the properties for sale, nor had they solicited any offers for the purchase of the properties by San Juan or by anyone.

On December 13th, Honaker was advised by Bateman, who had come with James to inspect the records, that San Juan probably would be willing to make an offer of $1,600,000. Honaker advised Bateman that this wasn't enough, but that he might be interested in an offer of $1,700,000 to $1,800,000. On December 20th, the president of San Juan called Honaker and told him that he was prepared to offer $1,600,000, and that after San Juan's engineers had had an opportunity to inspect the properties he might be willing to go higher. From this conversation, Honaker concluded that San Juan probably would offer at least $1,-700,000, which was a price to which he would give serious consideration. He, therefore, called his attorney, Carothers,

and his accountant, Koelling, to discuss the San Juan offer.

Honaker knew that Colorado Oil and Gas Corporation had a preferential right to purchase some of the properties which Honaker Drlg., Inc., held in joint ownership with that company. Prior to the offer from San Juan on December 20th, no one associated with Honaker Drlg., Inc., had sought advice from attorneys or accountants with respect either to the sale of the properties or to the dissolution of the corporation.

Honaker and Davis believed that the properties were not in fact worth the values shown by the DeGolyer & MacNaughton report, which was approximately $1,700,000. They were of the opinion that the properties were worth about $1,400,000. Consequently, the officers of the corporation believed that a sale at the price based on the reserves shown in the engineering report would be a very attractive business proposition.

On December 21st, Davis and Carothers flew to Denver to obtain from Colorado Oil and Gas a waiver of its preferential rights of purchase. When the request was made of Colorado Oil and Gas, that company advised Davis that rather than release their right to purchase they would exercise it. On December 22nd, Colorado made an offer of $1,700,000 cash, and as additional consideration, agreed to give the Honaker group a contract to drill for a one-year period all development wells on the properties being sold. A letter form of agreement was drawn and executed by the parties on December 22, 1955. It is not disputed that approximately $1,150,000 of the purchase price should be attributed to properties owned by the corporation and the balance of $550,000 should be attributed to properties owned by the Joe Honaker and Ruby Honaker partnership. None of the drilling rigs, tools or equipment owned by Honaker Drlg., Inc., were sold to Colorado Oil and Gas.

Through conversations with the corporation's accountant and attorney on December 20th and 21st, Honaker was advised that it would be possible and ad-

vantageous for the corporation to adopt a plan of dissolution pursuant to section 337 of the Internal Revenue Code prior to the execution of the contract to sell. Apart from the contention that Honaker Drlg., Inc., was a collapsible corporation, it is admitted that all of the requirements of section 337 have been met.

Subsequent to the sale, a partnership was formed which received the operating assets of Honaker Drlg., Inc., and that partnership has continued as an independent oil and gas producer. The partnership is composed of Joe Honaker, Ruby Honaker, Davis and Forbes. Honaker testified as follows with regard to the formation of the partnership:

"Q. Mr. Honaker, what was the condition of your health and your outlook and your mental attitude toward living or dying by January or February of 1956? A. We had gone through—I had gone through two years since the operation and I had improved my feeling, my outlook on life. I did not feel that I was going to be called to leave this earth anyway soon at that time. I had had another examination by Dr. Tihen. He told me that I was coming along in good shape. We had some hard cash and my children had some, and I looked at life entirely different than what I did in the previous two years.

"Q. And did that changed attitude and feeling on your part influence what kind— A. I had known Mr. Davis and Mr. Forbes and by this time I had become personally and intimately acquainted with them, I knew how they did business, I knew what kind of decisions they could make and I again advised with Mr. Koelling [Honaker's accountant] and Mr. Carothers [Honaker's attorney] and I wanted at that time to take my children out of the deal, because they had some cash and I didn't want to take the chance of losing it for them or risking it for them, and I asked their advice as to what I should do,

and they [Koelling and Carothers] suggested that I form a partnership." (Tr. 139, 140.)

From the sale of its properties to Colorado Oil and Gas, the partnership reported a long-term capital gain on the sale of § 1231 assets in the amount of $503,134. Honaker Drlg., Inc., reported the sale and the non-recognition of gain pursuant to § 337. The district director disallowed the distribution as a liquidation and assessed a deficiency at capital gains rates. The stockholders reported the distributions received upon liquidation and paid taxes thereon.

Section 341(b) defines a collapsible corporation, so far as here material, as one formed or availed principally for the manufacture, construction or production of property with a view to a distribution to its shareholders before the realization by the corporation of a substantial part of the taxable income to be derived from such property. The legislative history of the collapsible corporation section of the Code makes it clear that the practice legislated against was the familiar attempt to convert income taxable at ordinary rates into income taxable at capital gains rates. 1950 U.S.Code Cong.Serv. 3099, 3145, 3232; Message of the President to Congress of January 23, 1950. As stated in the Senate committee report:

"* * * The collapsible corporation is a device whereby one or more individuals attempt to convert the profits from their participation in a project from income taxable at ordinary rates to long-term capital gain taxable only at a rate of 25 percent." 1950 U.S.Code Cong.Serv., at page 3145.

The government has stated in its brief that:

"In general terms, therefore, a 'collapsible corporation' is one in which either the corporation itself or its stockholders take action designed to convert potential income of the corporation which, when received, would be taxable as ordinary income into capital gains." (P. 7.)

The government's definition is too broad, for it would cover the sale of any income-generating capital asset. A farm, a factory, an office building or a mine generates ordinary income in the usual course of events. When such assets are sold, future potential income from them is being taken down as a capital gain. General application of the government's definition would mean that whenever such an asset owned by a corporation is sold, the sale would subject the corporation and its stockholders to the consequences of Section 341. No reported case has been found which construes Section 341 so broadly.

It appears that the collapsible corporation first came into vogue in the entertainment, and particularly in the motion picture, industry. Actors, directors, writers and others who were in the higher tax brackets and whose salaries would have been taxable as ordinary income, utilized temporary, one-picture corporations as devices for converting the value of their services into corporate assets, represented by corporate stock. Later on, the collapsible corporation device was seized upon by builders of apartment projects using mortgages insured by the Federal Housing Administration. Judging from the reported cases, it apparently was possible in some cases for the builder to secure a larger F.H.A. loan then was required to finance the building. The usual pattern seems to have been to incorporate and issue more than one class of stock. Upon completion of the project, the building would then be written up above its actual cost, thereby creating a revaluation surplus, usually about equal to the amount by which the F.H.A. loan exceeded the actual construction cost. The revaluation surplus would then be used to redeem some of the stock and thus would be gotten into the hands of the incorporators as an apparent capital gain. See, e. g. Sidney v. C. I. R., 2 Cir., 1960, 273 F.2d 928; Payne v. C. I. R., 5 Cir., 1959, 268 F.2d 617; August v. C. I. R., 3 Cir., 1959, 267 F.2d 829; Glickman v. C. I. R., 2 Cir., 1958, 256 F.2d 108; Burge v. C. I. R., 4 Cir., 1958, 253 F.2d 765. In these cases the money received in the guise of a stock redemption was actually for items such as builders' and architects' fees (August); builders' fees, materialman profits and rental income (Payne); and bank premiums for mortgage placement (Sidney). The corporation was a necessary tool in all of these F.H.A. cases because there had to be a method available for writing up the value of the building project in order to get the excess F.H.A. money into the hands of the builders.

Other collapsible corporation cases have involved commodities such as liquor and cheese, which naturally appreciate in value with age, but they are not important here.

The definition of a collapsible corporation is particularly difficult to apply to a corporation engaged in the exploration, development and production of a natural resource. The report of the Senate Finance Committee on the Technical Amendments Act of 1958 noted this difficulty.

"* * * (I)n the case of corporations engaged in the development of natural resources, which have continued development activity, the shareholders of such corporations can never be certain that their stock interests in such corporations will not be regarded as stock interests in a collapsible corporation, notwithstanding the fact that their corporations have little or no inventories and that the properties of such corporations (if sold by the corporation or by the shareholders) would be regarded as properties the sale of which would result in capital gain." 1958 U.S.Code Cong. & Ad.News, p. 4821.

In order that Honaker Drlg., Inc. may be held to have been a collapsible corporation, it must be determined that (1) the corporation was availed of principally to engage in activities resulting in the construction or production of property; (2) the corporate activity was undertaken with a view to (that is, with the

intent of) getting the property into the hands of its shareholders; and (3) the distribution was made before the corporation had realized a substantial part of the taxable income to be derived from the property so constructed or produced.

■ When Honaker Drlg., Inc., was organized, it received seventeen leases on unproved acreage from the partnership. Three of these eventually were found to be productive, and the others were abandoned. These three were among the nineteen sold to Colorado Oil and Gas by the corporation in December, 1955. The other sixteen had been acquired by the corporation subsequent to its organization. Two of the leases sold to Colorado had no developed production, and as of January 1, 1960, there still had not been a barrel of oil produced from them. The corporation received $89,357 for those two leases. It is difficult to see how there could have been any construction or production as to those two leases. But all of the leases sold to Colorado should be considered collectively as the "property." This being so, it is believed that a reasonable interpretation of "construction or production" would require that the activities of obtaining leases, drilling wells on them and equipping the productive wells would have to be considered as within the phrase. See Rev.Rul. 57–346, 1957–2 Cum. Bul. 236. Contra, Hambrick, Collapsible Corporations in Oil and Gas: Does the 1958 Act Afford any Relief? 28 Geo.Wash.L.Rev. 815, 818 (1960). It seems clear that the principal use of the corporation was to engage in the above listed activities.

■ I am convinced that the sole reason for the organization of Honaker Drlg., Inc., was the situation created by the impairment of the health of Joe Honaker. There appears to have been no tax motive prompting the use of the corporate form of doing business. I also believe that the stockholders of Honaker Drlg., Inc., had no thought of selling out until the prospect of making an attractive profit presented itself. The earliest time when a view to making a distribution could have existed was December 12,

1955. It was not until the corporation was approached and asked to sell its leases that any thought or consultation was had on how such a transaction should be handled mechanically. No authority has been cited which condemns seeking professional advice in tax matters, nor is it required that taxpayers transact business in the way which produces the greatest amount of revenue for the government. There is no dispute here but that when it was decided to sell the bulk of the corporation's assets, advice was sought on the manner of making the sale in order to realize the maximum after-tax profit. There is no parallel between what was done in this case and the conduct of the taxpayers in the reported collapsible corporation cases. The statement of Chief Judge Lynne in Levenson v. United States, D.C.N.D.Ala.1957, 157 F.Supp. 244, at page 248, is illustrative of the picture presented in the usual collapsible corporation cases:

"To be perfectly candid, this court is not so naive as to suppose that a tax avoidance motive did not permeate the organization of the corporation and did not play a part in, indeed if it did not dictate, the time and the manner of the sale of the stock by its stockholders."

Such is not the case here. These taxpayers are of the class mentioned in the report of the Senate Finance Committee in 1958, supra, wherein it was recognized that the wording of section 341 in the 1954 statute was so broad as to

" * * * frequently impede or prevent legitimate business transactions and in some cases even result in the imposition of ordinary income taxes which would not be imposed if the shareholders of such corporations had not employed the corporate method of doing business." 1958 U.S.Code Cong. & Ad.News, p. 4820.

The gain resulting from the sale of leases sold by the partnership to Colorado Oil and Gas was taxed one time and at the capital gains rate. The stockholders

of Honaker Drlg., Inc., reported in their personal returns the amounts received upon liquidation and paid capital gains tax on these amounts. The following statement in the government's brief (footnote 2, p. 11) suggests that if Honaker Drlg., Inc., is held to have been a collapsible corporation, the next step will be to assess a deficiency against the individuals, taxing the liquidation distributions as ordinary income pursuant to section 341(a):

"The liability of the individual taxpayers for their personal income tax is not presently before this Court. In any event, while it is true that the taxpayers, as individuals, reported their gain as capital gain in their tax returns, it is not correct to state that the Commissioner has accepted that treatment as being in accordance with law. The liability of these individuals has not been finally determined, and the tax year involved is still open for such determination."

If Honaker Drlg., Inc., is determined not to have been a collapsible corporation, then the distribution pursuant to section 337 will bear the same tax consequences as the sale of the leases owned by the partnership.

This is the factor which distinguishes the instant case from the reported collapsible corporation cases. In the reported cases, a corporation had to be utilized to convert rents, engineering and architectural fees, materialman profits, mortgage placement premiums, actors' and directors' salaries, and excess loan funds from ordinary income to capital gain. A reading of the legislative history of the collapsible corporation section of the code leads to the conclusion that it was this problem which Congress sought to solve by the enactment of section 341. But in the instant case, the leases which were sold were assets the sale of which would be taxed as capital gains whether owned by individuals, partners, or a corporation. It is thus concluded that there was no intent to liquidate the corporation before a substantial part of the tax-able income from the leases had been realized. There was no intent to convert ordinary income into capital gain through the device of a corporation, because there was no need to utilize the corporate form in order to realize a capital gain.

In the Burge case, supra, there was a sale of the entire stock of the corporation following the redemption which put the excess F.H.A. loan money into the hands of the taxpayers. This sale was held to be the sale of stock of a collapsible corporation, and it is certainly true that the apartment building ordinarily would be held to be a capital asset regardless of who owned it. But in the Burge case, there was nothing to indicate that anything but tax motives fostered the corporate form. The taxpayers and incorporators invested only $100 in the corporation which was to build a project worth over one and one-half million dollars. The sale of the stock was made through an agent who had been retained. to find a buyer. The sale followed a redemption, the only purpose of which was to attempt to take the excess loan money down as a capital gain.

Some comment is in order with respect to the government's contention that Honaker Drlg., Inc., had not realized a substantial part of the taxable income from the leases before they were sold. The government claims that only about 4.8% of the potential taxable income from the leases had been realized. The taxpayers claim that about 34% of the taxable income had been realized. The difference between these two positions stems from section 263(c) of the Code, which allows the expensing of intangible drilling and development costs as they are incurred. The government points out in its brief that Honaker Drlg., Inc., had revenues of about $400,000 from oil sales and expensed about $300,000 of intangible drilling and development costs in its income tax returns. The government contends that by electing to expense intangibles, the corporation was deducting the costs assignable not only to the oil produced, but also attributable to the oil yet to be produced.

Here we have the exact problem noted in the 1958 report of the Senate Finance Committee, supra. Can the shareholders of a corporation engaged in the development of natural resources, which has continuing development activity, ever be certain that their stock interests will not be regarded as those of a collapsible corporation? The government's argument on this point apparently proceeds on the assumption that if these leases had not been sold by Honaker Drlg., Inc., there would have been no more drilling and development. The more reasonable assumption is that the corporation would have continued to acquire new leases, continued the drilling and development of new and old leases, and continued to incur and expense its intangibles. The DeGolyer and MacNaughton report shows that on the leases sold by Honaker Drlg., Inc., to Colorado Oil and Gas the gross developed production was about two million barrels, the gross developed but non-producing reserve was about 640,000 barrels and the proven but undeveloped reserve was in excess of four million barrels. From this it must be concluded that there was still a substantial amount of drilling and development to be done on the leases. Proceeding on the government's theory, Honaker Drlg., Inc., could have continued in its normal operation for years; continued to acquire leases; continued to incur and expense large drilling and development costs; and because of the election available under section 263(c), and because of the nature of the business, never realize a substantial part of the taxable income to be derived from its leases.

I find that Honaker Drlg., Inc., was not formed or availed of with a view to the accomplishment of the purposes set out in § 341(b) (1) (A) and (B), and hence that it was not a collapsible corporation within the meaning of that section.

Counsel will submit suggested findings and conclusions in accordance with this decision and in compliance with Rule XXI of the Rules of this court.