**UNITED STATES of America,**
**Appellant,**

v.

**Harold W. IVEY and Mrs. Virginia Ivey,**
**Appellees.**

**Harold W. IVEY and Mrs. Virginia Ivey,**
**Appellants,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 18568.**

United States Court of Appeals
Fifth Circuit.

Oct. 6, 1961.

Howard A. Heffron, Acting Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice, Washington, D. C., Charles D. Read, Jr., U. S. Atty., Atlanta, Ga., Slaton Clemmons, Asst. U. S. Atty., Atlanta, Ga., David O. Walter, Atty., Dept. of Justice, Washington, D. C., Abbott M. Sellers, Acting Asst. Atty. Gen., Harry Baum, I. Henry Kutz, Attys., Dept. of Justice, Washington, D. C., Charles K. Rice, Asst. Atty. Gen., for appellant.

Allen Post, J. Wm. Gibson, Alex McLennan, Moise, Post & Gardner, Atlanta, Ga., for appellees.

Before RIVES, CAMERON and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

There are two unrelated issues in this tax litigation. The first concerns collapsible corporations. The government contends that in explaining collapsible corporations to the jury the trial judge erred in charging the jury as to the critical time when the requisite "view" to use the corporate device as a tax avoidance scheme must exist. The taxpayer finesses this issue. He argues that Section 341 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 341, defining "collapsible corporations" is inapplicable when a taxpayer is entitled to capital gains treatment without benefit of incorporating. He points out that the Service, by taking a literal view of the language of Section 341 of the 1954 Code, arrives at a result that is the converse of the intended result of the law: instead of relying on Section 341 to prevent the conversion of ordinary income into capital gains, the Service interprets the section to convert capital gains into ordinary income. Basically, we agree with the taxpayer's position. We remand, however, for further evidence and resubmission of the case to the jury on proper instructions, because it is not clear that this taxpayer established that he was otherwise entitled to capital gains treatment. The second issue is the sufficiency of the evidence to support a jury verdict that the taxpayer, under Section 165 of the 1954 Code, was not entitled to a deductible loss for de-

molishing two buildings. On this point, we hold for the Government.

I

A. The taxpayer, Harold W. Ivey, purchased an unimproved lot for $42,500 February 9, 1954 and spent about $2,500 on minor improvements. Some months later, he and two friends formed the 2520 Peachtree Road Corporation, each stockholder receiving one-third of the stock. October 1, 1954 they transferred the lot to the corporation in return for the corporation's note for $25,000 and 250 shares of stock having an aggregate par value of $25,000. In October 1954 the corporation started to build an apartment building on the lot. During construction it was apparent that the building would be completely rented. When the building was about 75 per cent completed, July 11, 1955, the taxpayer sold his stock for $100,000.

The Government asserts that under the collapsible corporation provisions of Section 341 of the 1954 Code this gain is taxable at regular income rates. The taxpayer asserts that he regarded the transaction as a long-term capital investment: that his $55,000 profit is like the profit on any other investment.

In his charge to the jury the trial judge defined a collapsible corporation, in terms of the statute,[1] as "a corporation formed or availed of principally for the manufacture, construction, or production of property * * * with a view to the sale or exchange of stock by its shareholders * * * before the realization by the corporation * * * constructing * * * the property of the * * * income to be derived from [the same]." He couched the issue as follows: "Has the Plaintiff Harold W. Ivey proved by a preponderance of the evidence that said Plaintiff did not convey Property Number 2520 Peachtree Road to the 2520 Peachtree Corporation with a view to the sale of his stock therein in order to obtain capital gains treatment. Yes; no." After deliberating for a while, the jury returned to the courtroom and asked for additional instructions on this issue. "In the charge," the foreman said, "we got confused * * * Does [the intent] have to be at the formation of the corporation or in between then and the sale of his stocks?" The court replied: "I believe, Gentlemen, that the critical date there is the date when the Plaintiff conveyed his property to the corporation with a view to the sale of stock. I so interpret it that way, and that's the way I worded the verdict. Well, I'll ask you, Lady and Gentlemen, to continue to consider the case." After

---

1. The pertinent portions of the statute are as follows:

"Sec. 341(a) Treatment of gain to shareholders.—Gain from—(1) the sale or exchange of stock of a collapsible corporation, (2) a distribution in partial or complete liquidation of a collapsible corporation, which distribution is treated under this part as in part or full payment in exchange for stock, and (3) a distribution made by a collapsible corporation which, under section 301(c) (3) (A), is treated, to the extent it exceeds the basis of the stock, in the same manner as a gain from the sale or exchange of property, to the extent that it would be considered (but for the provisions of this section) as gain from the sale or exchange of a capital asset held for more than 6 months shall, except as provided in subsection (d), be considered as gain from the sale or exchange of property which is not a capital asset.

"(b) Definitions.—(1) Collapsible corporation.—For purposes of this section, the term 'collapsible corporation' means a corporation formed or availed of principally for the manufacture, construction, or production of property, for the purchase of property which (in the hands of the corporation) is property described in paragraph (3), or for the holding of stock in a corporation so formed or availed of, with a view to—(A) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, before the realization by the corporation manufacturing, constructing, producing, or purchasing the property of a substantial part of the taxable income to be derived from such property, and (B) the realization by such shareholders of gain attributable to such property."
This section replaces Section 117(m) of the Internal Revenue Code of 1939, which was enacted in 1950.

the jury retired, Government counsel excepted to the charge. The trial judge repeated that the requisite intent to collapse the corporation must exist at the time one becomes a stockholder, that is, *"before the construction."* After further deliberation the jury returned a verdict for the taxpayer.

The Government concentrates on the incorrectness of the charge.[2] We defer discussion of this question, however, since its relevance to our decision depends on the correctness of the taxpayer's contention that the statute is not applicable to his gain.[3]

 There are two approaches to the issue the taxpayer raises: (1) As a matter of statutory interpretation, is Section 341 applicable to taxpayers who would have been entitled to capital gains treatment without incorporating? (2) Or does the fact that the taxpayer has no need for the corporate device simply bear on the question of "view" or "intent"? If the second approach is taken, the question is for the jury with proper instructions on the meaning of "view" and the time when it must exist in order for the corporation to be collapsible. We take the first approach, because it seems closer to the underlying congressional purposes. We hold that Section 341 does not penalize the taxpayer by converting his capital gain into ordinary income. The taxpayer, however, must first establish that he would have been entitled to capital gains treatment, without having incorporated.

B. Construction of the statute in the instant case does not involve extracting meaning from unclear statutory language or choosing one of several reasonable meanings. Cf. Commissioner of Internal Revenue v. Kelley, 5 Cir., 1961, 293 F.2d 904. On the point at issue, the language

is clear, except that if we should take it at its face value and construe it as encompassing all of the situations it seems to encompass, we should have to attribute to Congress the contradictory intention of producing in some situations converse and opposite effects to those primarily intended.

The statute has never been taken literally, even by the Treasury. To do so would produce the strange result that if a corporation is *formed* with a view to collapsing it, the corporation, would be collapsible under the express terms of section 341, even if the stock should never be sold, exchanged, liquidated, or distributed. The Senate Committee Report accompanying the Technical Amendments Act of 1958 cited several examples of how a literal construction of the broad language of Section 341 would impede legitimate business transactions.[4] For example, an oil and gas corporation engaged in development activities would be collapsible notwithstanding the fact that it has little or no inventory and the sale of properties of the corporation (if sold by the corporation or the stockholder) would result in capital gain. "Similarly," the Committee pointed out, "real-estate corporations established by investors (as distinguished from dealers) holding rental property for investment only may be regarded as collapsible corporations under [the] present law." [5]

The Treasury has shown the proper way to solve the problem. In a ruling on ordinary income realized at the corporate level by the sale of stock of a collapsible subsidiary the Treasury stated: "The evil at which the statute was aimed is not present and the effect of the literal interpretation suggested earlier would be to impose what would amount to a

---

2. The taxpayer does not defend the court's instructions. Instead, he argues that under Rule 49(a), F.R.Civ.P., 28 U.S.C.A., the government cannot complain that an issue was not submitted to the jury, because the government did not object to the framing of the question. This argument ignores the fact that the question reflected the charge and that the government objected to the charge.

3. See D of Part I of this opinion.

4. Sen.Rep. No. 1983, 85 Cong., 2d Sess.; 3 U.S.C.Cong. and Adm.News, pp. 4791, 4820, 4821 (1958); Cf. Honaker Drilling, Inc., v. Koehler, D.C.Kan.1960, 190 F. Supp. 287.

5. Ibid at page 4821.

penalty tax at the shareholder level through requiring the gain attributable to property produced by a collapsible subsidiary to be taxed at both levels as ordinary income. There is no evidence in the legislative history that Congress intended such a result. Thus, it would be unreasonable to adopt the suggested literal interpretation." Rev.Rul. 56–50, IRB 1956–8, 6.

■ Proper judicial respect for the "plain meaning rule" (a rule, in part, at least, based on the traditional English antipathy to legislative history as an aid to construction) does not require unthinking obedience to literalism. "[E]ven when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole' this Court has followed that purpose, rather than the literal words. When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may be on 'superficial examination' ". United States v. American Trucking Association, 1940, 310 U.S. 534, 544, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345. And when language is so broad that a literal construction would in certain cases make nonsense of the statute in the light of purposes of the legislation, it is reasonable to make sense of the statute by not applying it when the mischief at which it is aimed is absent. The legislative history of Section 117(m) of the 1939 Code, the predecessor to Section 341 of the 1954 Code, shows beyond dispute that the mischief was the taxpayers' abuse of the corporate device as a technique for transmuting ordinary income into capital gains.[6] Only by reading the purpose into the words of the law can it be said that the law has a plain meaning. See Hart, Judicial Process, p. 1157 (Mim.1961).

Section 117(m) was drafted with particular reference to use of the collapsible corporation in the movie and construction industries? In the typical case a corporation would be organized to produce a single picture; the directors and actors would receive stock instead of salaries, and the stock would be sold or the corporation liquidated as soon as the picture was made. The persons chiefly responsible for the production of the picture would not receive salaries commensurate with their contribution to the production; the value of the corporate assets would be swollen by the difference. The stockholders would recover the fruits of their labor upon disposition of their stock, but of course the earnings would return to them in the form of a capital gain. The key to the operation of this scheme was the device of channelling the productive efforts of the shareholders through the corporation. As the corporate property was constructed the value

---

6. Committee reports describe the collapsible corporation as "a device whereby one or more individuals attempt to convert the profits from their participation in a project from income taxable at ordinary rates to long-term capital gain taxable at a rate of 25 per cent." H.R.Rep. No. 2319, 81st Cong.2d Sess. 96 (1950–2 Cum. Bull. 380, 449); Sen.Rep. No. 2375, 81st Cong.2d Sess. 88 (1950–2 Cum.Bull. 483, 546). The Senate Committee Report accompanying the Technical Amendments Act of 1958 state the general understanding of section 341: "The purpose of this provision, enacted originally in 1950, is to prevent income which would otherwise be taxed at ordinary income-tax rates from being converted into income taxable at capital-gain rates merely by use of the corporate entity." S.Rep. No. 1983, 85th Cong., 2 Sess. (reproduced in 3 U.S.C.Cong. & Adm.News (1958) pp. 4791, 4820). See similar statements in President Truman's message to Congress, January 23, 1950, H.Doc. No. 451, Hearings before Committee on Ways and Means on Revenue Revision of 1950, 81st Cong., 2d Sess. 2, 5 (1950). As the Second Circuit recently expressed it, "the statute was enacted to stop taxpayers' alchemy by which they sought to convert ordinary income into capital gains by means of using corporations formed for this purpose." Mintz v. Commissioner, 2 Cir., 1960, 284 F.2d 554, 557. There is a vast body of legal comment on the collapsible corporation. For a collection of articles see Commissioner of Internal Revenue v. Kelley, 5 Cir., 1961, 293 F. 2d 904 note 11.

of their efforts, which would otherwise have accrued directly to the individuals as a right to salary or as property that when sold would yield ordinary gain, was held within the corporation increasing the value of its stock. The corrective statute was designed to collapse the corporate facade and impose the ordinary income treatment which the transactions deserve.

Carefully defined principles have been evolved for determining the circumstances under which income should receive capital gains treatment. The determination rests primarily on the character of the gain and the relation of the nature of the gain to the nature of the taxpayer's business. The collapsible corporation provisions conform with these principles. It would be ironic if the provisions were construed to require earnings which ordinarily should be capital gains to be treated as ordinary income.

There is no way to fit in such a result with a rational pattern of capital gains taxation. If, for tax purposes, the corporate form is ineffective and the court should pierce the corporate veil, the gains should be attributed directly to the shareholder. In such a case they should be capital gains, if the individual taxpayer is entitled to capital gains treatment. If, on the other hand, the court should not pierce the corporate veil, the sale of the shareholder's stock should be treated as if it were the sale of any other capital asset. To construe this statute to make the taxpayer's profits taxable as ordinary income, even though in the absence of a corporation they would have been capital gains, would be to carve out a special

group of cases for special treatment inconsistent with that accorded capital gains generally. This would impose the hardship of unduly heavy taxation on innocent persons whose capital gains happen to fall within the language of the statute.

Honaker Drilling, Inc. v. Koehler, D.C. Kan.1960, 190 F.Supp. 287 is the only decision we have found in which the question was squarely faced. In that case a corporation was organized in June 1954 to engage in the production of oil and gas. It was dissolved in April 1956. The principal owner of the business had undergone an operation for the removal of a malignant tumor on his chest and had been advised that recurrence of the cancer was highly likely. He formed the corporation as part of an effort to put his business affairs in better order. In December 1955 Honaker received a very attractive offer to purchase substantially all the oil and gas leases owned by the corporation. The corporation accepted the offer and adopted a plan of dissolution under section 337 of the Internal Revenue Code. The district court held that the corporation was not "collapsible" within the meaning of the statute. The court reasoned that since the sale of the leases would be taxed as capital gains whether owned by individuals, partners, or a corporation there was no need to utilize a corporation to realize a capital gain. Looking to the legislative history,[7] the statutory purpose, and the taxpayer's intent, the court held that Honaker Drilling, Inc. was not a collapsible corporation within the meaning of section 341.[8]

---

7. See H.R.Rep. No. 2319 and Sen.Rep. No. 2375, 81 Cong.2nd Sess. (1950–2 Cum. Bul. 380, 449, 483, 456).

8. "In the reported cases, a corporation had to be utilized to convert rents, engineering and architectural fees, materialman profits, mortgage placement premiums, actors' and directors' salaries, and excess loan funds from ordinary income to capital gain. A reading of the legislative history of the collapsible corporation section of the code leads to the

conclusion that it was this problem which Congress sought to solve by the enactment of section 341. But in the instant case, the leases which were sold were assets the sale of which would be taxed as capital gains whether owned by individuals, partners, or a corporation. It is thus concluded that there was no intent to liquidate the corporation before a substantial part of the taxable income from the leases had been realized. There was no intent to convert ordinary income

We have considered the massive authority on the purpose of this statute, the inapplicability of that purpose to the instant case, the inconsistency with the principles of capital gains taxation which would inhere in applying the statute to the facts of this case, and the irrationality of the hardship that would be imposed on the taxpayer. These factors lead us to conclude that Section 341 should not be read as applicable to cases where the shareholder's gain would be taxable as a capital gain had he realized it directly rather than through the corporate vehicle.

■ C. Although we agree with the taxpayer's reasoning, we question the premise on which it is based. The premise is the taxpayer's assumption that "had the corporate form not been used, the profit unquestionably would be taxable as a capital gain." This premise cannot be taken for granted, in the circumstances of this case.

Section 1222(3) defines a long-term capital gain as the "gain from the sale or exchange of a capital asset held more than 6 months." Section 1221 defines a capital asset as "property held by the taxpayer (whether or not connected with his trade or business), but does not include—(1) stock in trade * * * or property held by the taxpayer primarily for sale to customers in ordinary course of his trade or business; (2) * * * real property used in his trade or business * * *." Section 1231 provides that gains from the sale of assets used in a trade or business must be netted against losses from such sale, but in effect provides for application of the capital gains rate to the net gain. There is a serious question, therefore, whether the assets here involved were property held primarily for sale to customers in the ordinary course of the taxpayer's business. This requires a determination of the relation of the property sold to the "trade or business" of the taxpayer. The taxpayer points out that the property sold was real estate and asserts that he was not in the real estate business. But the building on the property was constructed by the corporation and a large part of the gain realized was attributable to the construction of the building. The question of the trade or business of taxpayer was not considered below and any evidence in the record on this point appears there only as a comment in passing during testimony directed at other issues. Accordingly, we remand the case for determination of this question.

■ D. The remand revives the Government's contention that it was erroneous for the district court to charge that the requisite "view" to the sale of the stock before the corporation has realized a substantial part of the income from the property must exist before or near the beginning of the construction project. If the taxpayer held the property for sale to customers in the ordinary course of his construction business, so that gains from the sale would be ordinary income, it may well be that, after all, the statute would be applicable. This question must be resolved.

Treasury Regulations under section 341 read in part:

"A corporation is formed or availed of with a view to the action described in section 117(m) (2) (A) if the requisite view existed at any time during the manufacture, production, construction, or purchase referred to in that section. Thus, if the sale, exchange, or distribution is attributable solely to circumstances which arose after the manufacture, construction, production, or purchase (other than circumstances which reasonably could be anticipated at the time of such manufacture, construction, production, or purchase), the corporation shall, in the absence of compelling facts to the contrary, be considered not to have

into capital gain through the device of a corporation, because there was no need to utilize the corporate form in order to

realize a capital gain." Honaker Drilling, Inc. v. Koehler, D.C.Kan.1960, 190 F.Supp. 287, 294.

been so formed or availed of. However, if the sale, exchange, or distribution is attributable to circumstances present at the time of the manufacture, construction, production or purchase, the corporation shall, in the absence of compelling facts to the contrary, be considered to have been so formed or availed of." [9]

Although there is some disagreement as to whether a corporation is collapsible if the view exists after construction but during the life of the corporation,[10] the cases agree with the regulations that the corporation is collapsible if the view exists at any time before completion of construction.[11] As long as the construction of the property is incomplete the opportunity exists to channel a portion of the taxpayer's constructive efforts through the corporate device. And the corporation may be "availed of with a view to" effecting a tax avoidance scheme. The logical limit to the reach of the collapsible corporation provisions is, therefore, the point at which the construction of the property is completed. This limit seems implicit in the language of the statute, "availed of for the construction," and is logically inherent in the purpose of the statute. We agree with the Government's contention that the statutory test is met if the requisite view exists "before completion of the construction" and that it is not necessary for it to exist at the earlier time indicated by the trial judge.

E. We note further that in no event will the taxpayer be entitled to capital gains treatment of his entire profit. Part of that profit is attributable to the construction of an apartment building on the land. Construction of this building began in October 1954 and was still in process when the taxpayer sold his stock July 11, 1955. We may assume that some construction occurred within the six months preceding the sale of the stock. Gain attributable to such construction fails to satisfy the six-month holding period requirement for capital gains treatment, and an apportionment of the profit must therefore be made. Paul v. Commissioner, 3 Cir., 1953, 206 F.2d 763; Commissioner v. Williams, 5 Cir., 1958, 256 F.2d 152.

For the reasons stated, we remand this portion of the case for proceedings not inconsistent with this opinion.

## II

The second issue concerns two houses the taxpayer demolished in 1955. He claims a deductible loss under section 165 of the Internal Revenue Code. The jury verdict denied the deduction.

December 9, 1954, Mr. Ivey purchased two adjoining houses and lots on Maple Drive in Atlanta, Georgia, paying $24,000 for each house and lot. He rented both houses to tenants on month-to-month leases for $125 per month. In April 1955 one of the tenants moved out. Mr. Ivey attempted to use the house as an office for his construction business, but soon found this not practical and

9. Section 29.117–11 of Treasury Regulations 111, issued on April 1, 1953 (added by T.D. 5999, 1953–1 Cum.Bull. 187). Section 39.117(m)–1(b) (4) of Treasury Regulations 118, applicable to taxable years beginning after December 31, 1951, is identical. Treasury Regulations on Income Tax (1954 Code), Section 1.341–2 (a) (3), filed on December 2, 1955, is also identical, except for reference to Section 341(b) instead of 117(m).

10. Compare Jacobson v. Commissioner, 3 Cir., 1960, 281 F.2d 703 with Burge v. Commissioner, 4 Cir., 1958, 253 F.2d 765 and Glickman v. Commissioner, 2 Cir., 1958, 256 F.2d 108. In Burge and Glick-

man the court held that a corporation could be considered collapsible if the view to the sale of stock existed at any time during the life of the corporation.

11. Sidney v. Commissioner, 2 Cir., 1960, 273 F.2d 928: Sorin v. Commissioner, 2 Cir., 1959, 271 F.2d 741; August v. Commissioner, 3 Cir., 1959, 267 F.2d 829; Glickman v. Commissioner, 2 Cir., 1958, 256 F.2d 108; Burge v. Commissioner, 4 Cir., 1958, 253 F.2d 765. See Mintz v. Commissioner, 2 Cir., 1960, 284 F.2d 554; Spangler v. Commissioner, 4 Cir., 1960, 278 F.2d 665, certiorari denied 364 U.S. 825, 81 S.Ct. 63, 5 L.Ed.2d 54.

shortly thereafter had the house demolished. The tenants vacated the other house in August, complaining of the demolition next door. Mr. Ivey razed that house too.

Section 165 provides, "There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise." The Regulations state that where property is purchased with the intent to demolish old buildings no loss shall be allowed for their demolition, but that when the intent to demolish is formed after the purchase of the property a loss shall be allowed for the value of the buildings and the costs of demolition. Treas.Reg. 1.165–3(a) and (b.)[12] The taxpayer recognizes the validity of the Regulations and both parties agree that the controlling question is whether the taxpayer had an intent to demolish the buildings at the time of the purchase. This is clearly a question of fact.

The Regulations list a variety of factors suggesting the presence of the intention at the time of the purchase. See Treas.Reg. 1.165–3(c) (1960). Two of these appear in the facts of this case: a short delay between the date of acquisition and the date of demolition and inability at the time of acquisition to realize a reasonable income from the buildings. None of the factors indicating the absence of intent are present.

Although the taxpayer made a heavy investment in the houses, the rent was sufficient to give him only about a three per cent net return on that investment. The jury might reasonably infer that the taxpayer would not have purchased the property with the expectation of holding it for rental at such a low return. R. E. Dorough, who was in the real estate business and appraised the lots bought by Mr. Ivey at the time of their purchase, testified that the neighborhood was becoming increasingly industrial, that there was a possibility that the property would be rezoned to allow commercial use of it, and that if rezoning did occur that the value of the land would go up. Mr. Dorough said that the properties were worth about seventeen or eighteen thousand dollars for residential use, but that with the possibility of the area being rezoned they had a market value of twenty-four or twenty-five thousand dollars. The land was appraised at $10,000 for each lot, more than forty per cent of the total price of house and lot. The seller of one of the lots was told that the buyer would not buy one of the adjoining lots without the other. In December 1955 the land was rezoned for business use. This testimony strongly supports the inference that Mr. Ivey purchased the property expecting a change in the zoning law that would enable him to construct buildings suitable for commercial purposes. Mr. Ivey testified that he did not intend to

12. These Regulations provided: "§ 1.165–3. Demolition of buildings.—(a) *Intent to demolish formed at time of purchase.* (1) Except as provided in subparagraph (2) of this paragraph, [which is not relevant to this case] the following rule shall apply when, in the course of a trade or business or in a transaction entered into for profit, real property is purchased with the intention of demolishing either immediately or subsequently the buildings situated thereon: No deduction shall be allowed under section 165(a) on account of the demolition of the old buildings even though any demolition originally planned is subsequently deferred or abandoned. The entire basis of the property so purchased shall, notwithstanding the provisions of § 1.167(a)–(5), be allocated to the land only. Such basis shall be increased by the net cost of demolition or decreased by the net proceeds from demolition. * * *

"(b) *Intent to demolish formed subsequent to the time of acquisition.* (1) Except as provided in subparagraph (2) of this paragraph, [which is not relevent to this case] the loss incurred in a trade or business or in a transaction entered into for profit and arising from a demolition of old buildings shall be allowed as a deduction under section 165(a) if the demolition occurs as a result of a plan formed subsequent to the acquisition of the buildings demolished. The amount of the loss shall be the adjusted basis of the buildings demolished increased by the net cost of demolition or decreased by the net proceeds from demolition * * *."

demolish the houses when he bought the lots and that he did not know that the land might be rezoned. It was up to the jury to accept or reject the taxpayer's explanation. Substantial evidence supports the verdict.

The decision on this question is affirmed.

CAMERON, Circuit Judge (concurring in part and dissenting in part).

I would affirm the actions and judgment of the district court on all questions involved. I, therefore, dissent from the holdings of the majority opinion to the extent that they reverse portions of the decision of the court below, and I concur with those parts of the majority opinion which affirm the action and judgment of the court below.