Elizabeth M. AUGUST (Formerly Elizabeth Magen), Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

Sam MADWAY and Theresa Madway (Husband and Wife), Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

Ralph K. MADWAY and Bette D. Madway (Husband and Wife), Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

Jacob MARGOLIS and Pauline Margolis (Husband and Wife), Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

Harry K. MADWAY and Beatrice B. Madway (Husband and Wife), Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

Nos. 12825–12829.

United States Court of Appeals
Third Circuit.

Argued May 7, 1959.

Decided June 12, 1959.

Fred L. Rosenbloom, Philadelphia, Pa. (Schnader, Harrison, Segal & Lewis; Blank, Rudenko, Klaus & Rome; Thomas P. Glassmoyer and Barton E. Ferst,

Philadelphia, Pa., on the brief), for petitioners.

George W. Beatty, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Harry Baum, Attorneys, Department of Justice, Washington, D. C., on the brief), for respondent.

Before McLAUGHLIN, KALODNER and STALEY, Circuit Judges.

STALEY, Circuit Judge.

We are presented on this appeal with the not uncommon question whether the gain realized by the shareholders of a corporation upon a partial redemption of their stock is taxable as long-term capital gain, or is taxable as ordinary income under the provisions of Section 117(m) of the Internal Revenue Code of 1939, 26 U.S.C.A. (I.R.C.1939) § 117(m), the collapsible corporation section.

The facts as found by the Tax Court were stipulated in part. This proceeding, in which five cases have been consolidated, involves alleged deficiencies in income tax for the taxable year 1950.[1] Sam Madway, Ralph K. Madway and Harry K. Madway are brothers, and Elizabeth M. August and Pauline Margolis are their sisters.[2] Hereinafter these five will be referred to as petitioners.

Harry K. Madway has been engaged in the building business since 1928, first as a construction superintendent and from 1936 as a principal. With the exception of a three-year period during the war when he acted as a consultant to the federal government on housing construction, he has been so engaged continuously. Among the construction projects superintended by him during the former period were two large apartment houses. In addition, in 1943 he purchased an apartment house which he has since owned and operated. His brother Sam Madway was a registered civil engineer, and his brother Ralph had acquired substantial experience in construction work.

Petitioners organized the Camden Housing Corporation (Camden) under New Jersey law on July 26, 1945, with the petitioners as its sole stockholders. Initially it was capitalized for $1,000 represented by 500 shares of no-par common stock. In October, 1947, Camden's charter was amended to authorize preferred stock and two classes of common stock. Other than the fact that all voting rights were vested in the Class A common stock, the attributes of the two varieties of common stock were identical. The common stock was divided among the stockholders as indicated in the margin.[3] The

---

1. The Commissioner determined the following deficiencies, which were sustained by the Tax Court:

| | |
|---|---|
| Elizabeth M. August | $27,842.34 |
| Sam & Theresa Madway | 7,235.64 |
| Ralph K. & Bette D. Madway | 7,325.25 |
| Jacob & Pauline Margolis | 5,133.80 |
| Harry K. & Beatrice B. Madway | 19,413.05 |

2. Elizabeth M. August, who was married subsequent to 1950, filed an individual return for the year 1950 under her maiden name, Elizabeth Magen. The taxpayers in the four remaining suits were husband and wife, and each couple filed a joint income tax return for the year 1950.

3.

| | Number of Shares of Common Stock | |
|---|---|---|
| | *Class A* | *Class B* |
| Harry K. Madway | 50 | 300 |
| Elizabeth Magen August | 50 | 250 |
| Pauline Margolis | None | 100 |
| Sam Madway | None | 125 |
| Ralph K. Madway | None | 125 |
| Totals | 100 | 900 |

This stock represented all of the issued and outstanding capital stock of Camden from October 1947 until December 29, 1950.

cost basis of both classes of common stock was $2 per share.

Camden's charter authorized it to buy, sell, build, own, lease, and operate real estate, and shortly after its incorporation it purchased a tract of partially improved land in Camden, New Jersey. The tract, which was sizeable, was purchased for approximately $40,000. During the ensuing two years Camden proceeded to construct 126 row houses on a portion of the tract and succeeded in disposing of the last of them during the middle of 1947.

Camden then embarked on the development of the reserved portion of the tract which was regarded by petitioners as a suitable site for the construction of apartment houses to be held for rental purposes. Inasmuch as the federal housing program under Section 608 of the National Housing Act, 12 U.S.C.A. § 1743, offered means for the very favorable financing of such projects, petitioners sought and procured Federal Housing Administration (FHA) approval of the Camden tract for the construction of apartment houses. The FHA regulations as they then existed provided mortgage loan insurance on rental housing projects in an amount equal to 90 per cent of the amount which the FHA commissioner estimated would be the necessary current cost of the completed project.[4]

This estimate included the cost of the land, the proposed physical improvements, utilities within the boundaries of the project, architects' fees, taxes and interest accruing during construction, and other miscellaneous charges incidental to construction. In October, 1947, Camden undertook construction of twelve groups of apartment houses, to be known as the Washington Park Apartments, pursuant to the provisions of Section 608 of the National Housing Act. Although nei-

ther the dates nor amounts of the twelve applications made to FHA for commitments for mortgage loan insurance are shown, the Tax Court found that "Camden did seek to procure commitments for mortgage loan insurance for the largest mortgage loans permissible under the statute."

In arriving at its estimates of replacement cost for mortgage loan insurance purposes, it was the practice of the FHA to include a five per cent builder's fee and a five per cent architect's fee, and such fees were included by Camden in its applications. Included in the estimates of replacement costs on the total complex of apartment houses were $106,718 for land, $100,120 for builder's fees, $105,124 for architect's fees, and $17,150 for legal and organization expenses. The total estimate of the replacement cost amounted in the aggregate to $2,427,912, and after reduction to 90 per cent and application of other limitations the FHA issued commitments for mortgage loan insurance in the total amount of $2,154,600. Accordingly, Camden proceeded to procure construction loans from various banks.[5]

The construction of the entire apartment house complex was supervised by Harry, Sam, and Ralph Madway. Camden did its own brick and plumbing work, the former being handled by Ralph and the latter by Sam. Camden incurred a builder's fee of only $21,027 in the construction, that fee being paid to Madway Construction Company or Madway Engineers and Constructors. The architect's fee incurred and paid by Camden was $16,787.32. The total cost of construction for the Washington Park Apartments was $1,935,123.72, which when added to the cost of the land utilized by Camden brought the total cost of the project to $1,962,309.16. This left $216,654.08 remaining in unexpended mort-

---

4. This general statement as to the substance of the regulations is, of course, subject to several limitations; however, inasmuch as they are not particularly relevant to the problem before us, we feel no need to set them forth at length.

5. It was stipulated that four of the apartment buildings were completed on November 29, 1948; two on December 17, 1948; two on February 15, 1949; and the remaining four on April 20, 1949.

gage loan proceeds. These funds were retained by Camden and not applied in reduction of the outstanding mortgages on the Washington Park Apartments because, the Tax Court found, "they were regarded by petitioners as much more valuable to them as working capital in order to produce income in other enterprises." Other than the rental of the apartments as they were completed, the construction of the Washington Park Apartments was Camden's sole activity after 1947.

Following completion of construction, Camden had the apartment project appraised and in accordance with the appraisal resolved to write up the value of Washington Park Apartments to $2,256,-165.50. Thus a revaluation surplus of $361,057.48 was created.

At the time of Camden's incorporation in 1945, petitioners also acquired a tract of land, known as Merion Park, with a view to its future development. Following completion of the Washington Park Apartments, petitioners organized Merion Homes, Inc., and proceeded to make specific plans for the development of Merion Park. It was to consist of Colonial style, detached, masonry homes, in the "$20,000 price class" to be financed by conventional mortgages. After completion of several sample houses, the development was opened in the middle of 1950. The sales response was very satisfactory. Since the project was not FHA-sponsored, additional working capital was needed to take advantage of the healthy market.

On December 29, 1950, Camden redeemed fifty per cent of its outstanding Class A and Class B common stock and distributed to petitioners $205,000 [6] of the unexpended mortgage loan funds. This amounted to $410 for each share of Camden common stock redeemed. Thereafter, petitioners loaned all of the distributed funds to Merion Homes, Inc., and in addition contributed their remaining Camden stock.

The 1950 income tax returns involved herein reported the gain on the Camden distribution as long-term capital gain; however, the Commissioner determined that in accordance with Section 117(m) of the Internal Revenue Code of 1939 [7]

6. The amount received by each of the petitioners in redemption of the Camden stock was as follows:

| Harry K. Madway | $71,750 |
| Elizabeth M. August | 61,500 |
| Pauline Margolis | 20,500 |
| Sam Madway | 25,625 |
| Ralph K. Madway | 25,625 |

7. "§ 117. Capital gains and losses

\* \* \* \* \*

"(m) Collapsible corporations.

"(1) Treatment of gain to shareholders. Gain from the sale or exchange (whether in liquidation or otherwise) of stock of a collapsible corporation, to the extent that it would be considered (but for the provisions of this subsection) as gain from the sale or exchange of a capital asset held for more than 6 months, shall, except as provided in paragraph (3), be considered as gain from the sale or exchange of property which is not a capital asset.

"(2) Definitions.

"(A) For the purposes of this subsection, the term 'collapsible corporation' means a corporation formed or availed of principally for the manufacture, construction, or production of property, for the purchase of property which (in the hands of the corporation) is property described in subsection (a) (1) (A), or for the holding of stock in a corporation so formed or availed of, with a view to—

"(i) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, prior to the realization by the corporation manufacturing, constructing, producing, or purchasing the property of a substantial part of the net income to be derived from such property, and

"(ii) the realization by such shareholders of gain attributable to such property.

"(B) For the purposes of subparagraph (A), a corporation shall be deemed to have manufactured, constructed, produced, or purchased property, if—

"(i) it engaged in the manufacture, construction, or production of such property to any extent,

"(ii) it holds property having a basis determined, in whole or in part, by ref-

the gain was to be considered as gain from the sale or exchange of property which is not a capital asset. The Tax Court sustained the Commissioner's determination.

■■ Petitioners contend that Camden was not a collapsible corporation since the requisite view did not exist prior to completion of construction and the Tax Court's finding that it did exist is not supported by the evidence. We agree with petitioners that this is an ultimate finding of fact. Such finding is but a legal inference from other facts and subject to review free of the restraining influence of the "clearly erroneous" rule applicable to ordinary findings of fact made by the trial court. Philber Equipment Corp. v. Commissioner of Internal Revenue, 3 Cir., 1956, 237 F.2d 129; Curtis Co. v. Commissioner of Internal Revenue, 3 Cir., 1956, 232 F.2d 167. However, as we had occasion to say in Pennroad Corp. v. Commissioner of Internal Revenue, 3 Cir., 1958, 261 F.2d 325, 328, "where the ultimate fact reasonably flows from the basic facts and especially where the basic facts are persuasive of the ultimate fact so found,

this court will not disturb the findings of the trial court."

■ The argument proffered by petitioners is bottomed upon Treasury Regulation 111 [8] which construed Internal Revenue Code Section 117(m). Although at least one court has questioned the narrow interpretation placed upon Section 117(m) by the regulation in question, Glickman v. Commissioner of Internal Revenue, 2 Cir., 1958, 256 F.2d 108, we need not determine the validity of the regulation at this time. The Tax Court assumed the regulation to be valid and the petitioners can hardly complain that the assumption prejudiced them. However, the Tax Court went on to conclude, 30 T.C. 969, that "the evidence * * * persuasively and convincingly shows not only that the distribution herein was attributable to circumstances which could be anticipated at the time of construction of the apartments, and was contemplated as a recognized possibility, but that the circumstances to which the distribution was attributable were in fact so anticipated." In arriving at this conclusion the court considered that under the regulation it is sufficient if the cir-

erence to the cost of such property in the hands of a person who manufactured, constructed, produced, or purchased the property, or

"(iii) it holds property having a basis determined, in whole or in part, by reference to the cost of property manufactured, constructed, produced, or purchased by the corporation." 26 U.S.C.A. (I.R.C.1939) § 117(m).

8. "§ 29.117–11 Collapsible Corporations—
    *    *    *    *    *

"(b) Determination of Collapsible Corporation—
    *    *    *    *    *

"Under section 117(m) (2) (A), the corporation must be formed, or availed of with a view to the action therein described * * *. This requirement is satisfied in any case in which such action was contemplated by those persons in a position to determine the policies of the corporation * * *. The requirement is satisfied whether such ac-

tion was contemplated unconditionally, conditionally, or as a recognized possibility. * * *

"A corporation is formed or availed of with a view to the action described in section 117(m) (2) (A) if the requisite view existed at any time during the * * construction * * *. Thus, if the * * distribution is attributable solely to circumstances which arose after the * * construction * * * (other than circumstances which reasonably could be anticipated at the time of such * * * construction * * *), the corporation shall, in the absence of compelling facts to the contrary, be considered not to have been so formed or availed of. However, if the * * * distribution is attributable to circumstances present at the time of the * * * construction, * * * the corporation shall, in the absence of compelling facts to the contrary, be considered to have been so formed or availed of." 2 P–H Cum.Changes in Int.Rev. Code & Tax Regs. 8121.

cumstances which brought on or resulted in the distribution could, in reason, be anticipated at the time of the construction and that such a distribution was contemplated "unconditionally, conditionally, or as a recognized possibility." We have no doubt that this is a correct interpretation of the plain words of the regulation.

The sole question is therefore whether there is evidence to support the Tax Court's conclusion, the petitioners asserting that there was not. The Tax Court considered the following factors in arriving at its decision: Various items covered and included in the "estimates" were included as a matter of course and apparently without regard to whether or not there was any likelihood that any such costs would in fact be incurred, or be incurred in the amounts estimated—in this category should be placed the builder's fees, architect's fees, legal fees, and the cost of land. Harry Madway and his brothers were experienced builders; the brothers handled the brick and plumbing work themselves at, as they themselves indicated, a substantial savings. These facts were considered in light of the testimony of Harry Madway that they never considered using the surplus to reduce the mortgage inasmuch as it was more valuable to them as working capital in order to produce income in other enterprises. This, combined with the fact that they had purchased the Merion Park property at an earlier date for development and it required working capital, led the Tax Court to conclude as it did. We cannot, therefore, agree with petitioners that there was a lack of evidence upon which the Tax Court came to its ultimate finding. In fact, the conclusion it reached not only flows from the basic facts but is compelled by them. See Burge v. Commissioner of Internal Revenue, 4 Cir., 1958, 253 F.2d 765; Abbott v. Commissioner of Internal Revenue, 3 Cir., 1958, 258 F.2d 537.

The decisions of the Tax Court will be affirmed.