BENJAMIN BRAUNSTEIN AND DIANA BRAUNSTEIN, ET AL.,[1] PETITIONERS, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 56657–56659. Filed April 11, 1961.

*Louis Eisenstein, Esq.*, and *Julius M. Greisman, Esq.*, for the petitioners.

*Charles B. Markham, Esq., Colin C. Macdonald, Jr., Esq.*, and *Martin D. Cohen, Esq.*, for the respondent.

[1] The proceedings of the following petitioners are considered herewith: Estate of Benjamin Neisloss, Deceased, Julia H. Neisloss and Russell Neisloss, Executors, and Julia Neisloss, Docket No. 56658; and Harry Neisloss and Lillian Neisloss, Docket No. 56659.

[a] Benjamin Neisloss is now dead and his estate has been substituted as party petitioner, and where hereafter in our findings of fact and opinion Benjamin Neisloss is referred to as petitioner it is to be understood that the petitioner referred to is now his estate.

28

39

40

42

46

48

52

54

---

[25] This item as a liability to Oakland Gardens cannot be reconciled with other stipulated facts. Aside from the fact that in addition to the $300,000 mortgage, Oakland Gardens still owed $4,670.12 on the cost of constructing the shopping center, the stipulation covering the transfers of funds between N. B. partnership and Oakland Gardens indicates a substantially greater balance in favor of N. B. partnership.

58

[29] It was the testimony of Benjamin Neisloss that these actions numbered 100 to 150. Noting the fact that only apartments were covered by leases, the percentages of vacancies in the two projects combined would indicate that the number of vacancies throughout the spring of 1950 was considerably less than 100, even if it be assumed that actions had been started against all tenants who had broken their leases. On direct examination, Neisloss was asked what was the "rate of turnover in the spring of 1950," but upon objection to the effect that the books and records would be the best evidence, the question was withdrawn.

68

OPINION.

TURNER, *Judge:* It is the position of the petitioners that the applicability of section 117(m) of the Internal Revenue Code of 1939 was new matter pleaded by the respondent in his amended answers, and under Rule 32 of the Court's Rules of Practice, he has the burden of proof with respect thereto. It is our opinion that this position is not well taken. The facts of record definitely show that the applicability of section 117(m) was at all times recognized and understood by the parties on both sides of these cases to be a basis of the differences be-

tween them. That such was the case appears from the revenue agent's report and the protest of the petitioners. In that situation, the references in the notices of deficiency to the revenue agent's report and the protest make it clear that the applicability of section 117(m) to the stock sales proceeds and the distributions by Springfield and Hill was inherent in the respondent's determination. The burden of proof with respect thereto is accordingly that of the petitioners. *Rose Sidney*, 30 T.C. 1155, affd. 273 F. 2d 928. See also *C. D. Spangler*, 32 T.C. 782; *Leland D. Payne*, 30 T.C. 1034, affd. 269 F. 2d 615; and *Arthur Sorin*, 29 T.C. 959, affirmed per curiam 271 F. 2d 741.

The primary issue for decision is whether, under section 117(m),[31] the gains realized by the petitioners upon the distributions received by them from Springfield and Hill and upon the sale of their stock in those corporations are to be considered as gain from the sale or exchange of property which is not a capital asset.

According to section 117(m)(1), gain from the sale or exchange of stock of a collapsible corporation, whether in liquidation or otherwise, which gain, but for section 117(m), would be considered as gain from the sale or exchange of a capital asset, is to be considered as gain from the sale or exchange of property which is not a capital asset. According to section 117(m)(2)(A), a corporation is a collapsible corporation, if it is formed or availed of principally for the construction of property "with a view to * * * the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, prior to the realization by the corporation * * * of a substantial part of the net income to be de-

---

[31] SEC. 117. CAPITAL GAINS AND LOSSES.

(m) COLLAPSIBLE CORPORATIONS.—

(1) TREATMENT OF GAIN TO SHAREHOLDERS.—Gain from the sale or exchange (whether in liquidation or otherwise) of stock of a collapsible corporation, to the extent that it would be considered (but for the provisions of this subsection) as gain from the sale or exchange of a capital asset held for more than 6 months, shall, except as provided in paragraph (3), be considered as gain from the sale or exchange of property which is not a capital asset.

(2) DEFINITIONS.—

(A) For the purposes of this subsection, the term "collapsible corporation" means a corporation formed or availed of principally for the manufacture, construction, or production of property, for the purchase of property which (in the hands of a corporation) is property described in subsection (a)(1)(A), or for the holding of stock in a corporation so formed or availed of, with a view to—

(i) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, prior to the realization by the corporation manufacturing, constructing, producing, or purchasing the property of a substantial part of the net income to be derived from such property, and

(ii) the realization by such shareholders of gain attributable to such property.

*     *     *     *     *     *     *

(3) LIMITATIONS OF APPLICATION OF SUBSECTION.—In the case of gain realized by a shareholder upon his stock in a collapsible corporation—

*     *     *     *     *     *     *

(B) this subsection shall not apply to the gain recognized during a taxable year unless more than 70 per centum of such gain is attributable to the property so manufactured, constructed, produced, or purchased; * * *

rived from such property" and "with a view to * * * the realiza-
tion by such shareholders of gain attributable to such property."

It is the contention of the petitioners that under section 117(m)
and the regulations, section 29.117–11(b) of Regulations 111,[32] a
corporation is not a collapsible corporation, unless the "view to" sell
the stock of the corporation or have it make a distribution arose and
existed prior to completion of construction of the project; that with
respect to Springfield and Hill, the view to sell the stock or to have
them make distributions and the occurrences which gave rise to the
view to sell and distribute did not arise until near the end of May
1950, which, undisputedly, was after construction had been com-
pleted, and such being the law and the facts, Springfield and Hill
were not collapsible corporations within the meaning of the statute.

Much of the petitioners' argument is directed against matter con-
tained in briefs represented as having been filed by the Department of
Justice in cases before various of the United States Courts of Appeals.
It is charged that in those briefs the Department of Justice through
reiterated misstatements of the respondent's regulations has as-
siduously urged the Courts of Appeals to disregard the regulations
as invalid, with the result that in at least one case, *Glickman* v. *Com-
missioner*, 256 F. 2d 108, the court was sufficiently impressed to indi-
cate the view that it was sufficient under the statute if the requisite
view to sell or distribute was present at the time the corporation was
availed of for the proscribed purpose, even though the view to sell
or distribute did not in fact arise until after completion of construc-
tion, and that in that respect the regulation was narrower than the
statute. For the purposes of the instant cases, however, suffice it
to say that the Department of Justice briefs not being of record are
not before us, and further that the respondent not only does not urge

---

[32] Sec. 29.117–11. COLLAPSIBLE CORPORATIONS.

(b) *Determination of collapsible corporation.*— * * *

* * * * * * *

Under section 117(m)(2)(A), the corporation must be formed or availed of with a
view to * * * the sale or exchange of its stock by its shareholders, or a distribution to
them, prior to the realization by the corporation * * * constructing * * * the property
of a substantial part of the net income to be derived from such property, and the realiza-
tion by the shareholders of gain attributable to such property. This requirement is satis-
fied in any case in which such action was contemplated by those persons in a position to
determine the policies of the corporation * * *. The requirement is satisfied whether
such action was contemplated unconditionally, conditionally, or as a recognized pos-
sibility. * * *

A corporation is formed or availed of with a view to the action described in section
117(m)(2)(A) if the requisite view existed at any time during * * * construction. * * *.
Thus, if the sale, exchange, or distribution is attributable solely to circumstances which
arose after * * * construction * * * (other than circumstances which reasonably could
be anticipated at the time of * * * construction * * *), the corporation shall, in the
absence of compelling facts to the contrary, be considered not to have been so formed or
availed of. However, if the sale, exchange, or distribution is attributable to circumstances
present at the time of * * * construction * * *, the corporation shall, in the absence of
compelling facts to the contrary, be considered to have been so formed or availed of.

disregard of the regulations but to the contrary takes the position that on the facts Springfield and Hill were collapsible corporations within the meaning thereof. Thus in this instance the parties are in accord that the regulation is controlling and if we find that it covers the situation here, there will be no occasion to consider whether the scope of the statute is or is not broader than the regulation.

According to the regulations, a corporation formed principally for the construction of property is a collapsible corporation under section 117(m)(2)(A), if it was "formed or availed of with a view to * * * the sale or exchange of its stock by its shareholders, or a distribution to them, prior to the realization by the corporation * * * of a substantial part of the net income to be derived from such property." And this requirement is satisfied whether the described action "was contemplated unconditionally, conditionally, or as a recognized possibility." From the regulation, it would thus appear that the statute does not require that the view to sell or distribute be final or absolute, but that it is enough even though contemplation of the required action be qualified or conditional or a recognized possibility.

As to when the view to the proscribed action must exist, the regulation covers three situations. If the requisite view existed at any time during construction, the regulation categorically states that the corporation is formed or availed of with a view to the described action in section 117(m)(2)(A). Where, however, the sale or distribution is "attributable solely to circumstances which arose after * * * construction," the rule is that "the corporation shall, in the absence of compelling facts to the contrary, be considered not to have been so formed or availed of," provided, however, that the circumstances there in contemplation do not include "circumstances which reasonably could be anticipated at the time of * * * construction." If, on the other hand, the circumstances to which the sale or distribution was attributable were present at the time of construction, the reverse is the rule, the regulation prescribing that "the corporation shall, in the absence of compelling facts to the contrary, be considered to have been so formed or availed of."

As observed by the court in *Mintz* v. *Commissioner*, 284 F. 2d 554, affirming 32 T.C. 723, "exactly when the view arose is always difficult to determine." And that is particularly true where as here the only direct evidence which purports to fix the time when the view did arise or to specify the circumstances or occurrences to which the view was attributable was the testimony of Benjamin Neisloss, the only one of the three petitioners to testify. That his testimony was self-serving goes without saying but that does not mean that it is to be ignored for such testimony can be persuasive and convincing and particularly is that true when it is in harmony with and corroborated by evidence

otherwise derived. In substantial part, however, the testimony of Neisloss as to the basic facts advanced in support of his testimony as to the time the view arose is not corroborated by but is at variance with facts otherwise established of record.

The situation here is much the same in many respects as that in *Elizabeth August*, 30 T.C. 969, affd. 267 F. 2d 829. The petitioners here, as in that case, rely upon and stress the testimony of one of their number to the effect that when the construction of Springfield and Hill was begun they did not expect there would be an excess of mortgage proceeds over cost because they did not expect the actual cost of construction to be less than the amount shown in the FHA estimates, although they did hope the cost would not be greater than the amounts shown in the estimates, and that the savings on carpentry, lumber, and plumbing and heating were unexpected. As we stated, in that case it is of no particular significance whether at the time construction of Springfield and Hill was being considered the petitioners did or did not contemplate that they would be able to build the apartments for amounts less than the mortgage loan funds for under the regulations it is sufficient if the distribution or the sale of the stock was contemplated even "conditionally, or as a recognized possibility" or if the circumstances which brought on the distributions or the stock sales when they actually occurred in 1950 could in reason be anticipated at the time of construction. *Spangler* v. *Commissioner*, 278 F. 2d 665, affirming 32 T.C. 782; *Sydney* v. *Commissioner*, 273 F. 2d 928; *August* v. *Commissioner*, 267 F. 2d 829, affirming *Elizabeth August*, *supra*; *Glickman* v. *Commissioner*, *supra*; and *Burge* v. *Commissioner*, 253 F. 2d 765, affirming 28 T.C. 246. It is, of course, true that in FHA projects such as these mortgage loan funds may not exceed 90 percent of the amount estimated by the FHA as the cost of the completed property but as in the *August* case various items were included in the estimates as a matter of course and without regard as to whether or not such costs would in fact be incurred, or, if so, whether they would be incurred in the amounts shown in the estimates. Builder's and architect's fees were included in the estimates at $410,303 for Springfield and $189,438 in the case of Hill, although the record shows that it was the intent of the petitioners that the fees would never be paid as such. For Springfield title and recording expense was included in the FHA estimate at $89,400; the amount actually expended was $37,146.04. For Hill the title and recording expense was included in the FHA estimate at $41,268. It actually amounted to $16,989.23. Legal and organizational expense for Springfield was shown by the FHA estimates at $13,000. The amount actually incurred was $4,921.04. With respect to Hill, the amount shown by the FHA estimate was $5,600 whereas only $1,514.77 was

incurred. It is true that the amount shown as paid by Springfield as interest during construction was $157,636.72 as compared with $104,370 in the FHA estimate, and the amount shown as paid by Hill was $63,328.88 as compared with $48,170 shown as estimated therefor by the FHA in its project analysis. Be that as it may, the parties have stipulated that for income tax purposes only $10,281.73 of the $157,636.72 so expended by Springfield was capitalized whereas the remaining $147,354.99 was deducted and thus treated as a charge against income. As to Hill, the parties have stipulated that for income tax purposes only $14,825.80 of the $63,328.88 which was expended for interest during construction was capitalized, whereas the balance of $48,503.08 was deducted, and similarly treated as a charge against income.

With respect to carpentry and plumbing and heating, it was the testimony of Neisloss that in planning Springfield and Hill it had been their purpose to have the work done by subcontractors, but because the prices quoted by the subcontractors were higher than had been contemplated they decided to do the work from the beginning for their own account and in so doing their cost was less than estimated by $80,000 on carpentry and $85,000 on plumbing and heating. With respect to lumber, it was his testimony that they had anticipated they would need about 5 million board feet and the cost would be $100 per 1,000 board feet, whereas they were able to make their first purchases at $98.50 per thousand feet, from which the prices paid ranged downward so that the final purchases were as low as $75 per thousand feet and the savings for lumber on the two projects were approximately $50,000.

Another item of significance was the cost for the construction of off-site improvements which had been estimated by the FHA at $101,443 and which according to the closing agreement were to be constructed without cost to Springfield and for which a deposit in escrow was supposed to have been made. Exclusive of the $101,443 estimated as the cost for off-site improvements the FHA's estimate of the cost of the physical construction of the Springfield apartment and garages had been $4,002,959. Actually the cost to Springfield for the apartments, garages, and the off-site improvements combined was $3,807,908, or $159,051 less than the $4,002,959 which had been estimated for the apartments and garages alone, or $296,494 less than had been estimated for the three combined. There is no showing of the amount actually expended for off-site improvements or that any amount therefor was ever deposited in escrow by the petitioners, but from what is shown it would appear that such cost as was incurred was paid from mortgage money and thus became a liability of Springfield even though the FHA requirements were to the contrary.

In the case of Hill, a comparable factual picture is also shown with respect both to the construction cost of the apartments, garages and of the off-site improvements.

As shown by the facts, the total cost of the Springfield project, including the cost of the off-site improvements and including the entire $157,636.72 for interest paid during construction, was $4,069,007.82 which was less than the mortgage loan proceeds by $105,792.18. In the case of Hill, the total cost, including the cost of off-site improvements and including the entire $63,328.88 for interest paid during construction, was $1,872,834.53, which was less by $53,965.47 than the mortgage loan proceeds.

The petitioners were not novices in the construction business but were experienced builders. They had had substantial experience in comparable building operations, having constructed, among other housing projects, several apartments with FHA financing. And whatever their original plans may have been, we are satisfied that before and during actual construction they were fully aware of the savings factors and that they knew well before completion of the Springfield and Hill projects that there would be substantial balances of mortgage funds after all costs, including off-site improvements which were not supposed to be paid from mortgage loan funds, had been paid. Also, we are satisfied, as will hereafter appear, that plans had already been made for use of those funds which were wholly unrelated to the purposes and operations of Springfield and Hill.

As showing the basic facts to support the conclusion that there was no view to the distributions made or to the sale of the Springfield and Hill stock within the meaning of the statute and the regulations or stated otherwise the facts which precipitated or brought on the view to the action taken, the petitioners again rely on the testimony of Benjamin Neisloss, which was to the effect that having studied the literature of the FHA which stressed the stability and income-producing capacity of such projects and relying on the FHA estimates of the net income to be expected from Springfield and Hill, he, his brother, and Braunstein entered into the projects because they "saw the chances for a good return, management fees * * * profits" and "could accumulate over a period of time, some estate" for their families; that at no time before or during construction did they contemplate or have any intention to sell their stock or consider the possibility of selling or of having the corporations make distributions to themselves as the stockholders; they never listed the stock with brokers but refused to negotiate with several brokers who approached them after construction was completed and in March or April of 1950 refused an offer of $350,000 advising the broker that they were not interested in selling "at that

time"; and it was not until the last 2 weeks in May of 1950 when because of reduced rental receipts due to increased vacancies and to increases in real estate taxes and certain added costs of operations, which had not been anticipated or estimated for by the FHA, they decided to sell their stock as quickly as possible before the projects began to operate at a loss.

Relying on the FHA estimates the petitioners, according to Neisloss, had anticipated that the annual net income of the two projects would be approximately $78,000; that in making these estimates the FHA had allowed for vacancies at 7 percent and each two percentage points beyond the 7 percent as projected by the FHA would result in a loss of about $16,000 in rental income; that early in 1950 many tenants moved out because they found more desirable apartments or bought homes of their own, and about 100 suits were pending against tenants who had broken their leases; that in the first 3 months of 1950 they figured the vacancies at 9 percent or over 9 percent and in May they became extremely concerned when the percentage of vacancies failed to go down. Other factors which, according to Neisloss, brought on the change in their attitude toward continued ownership of the Springfield and Hill projects in late May of 1950, as contrasted with their refusal of the $350,000 offer in March or April were that in estimating the net income of the projects the FHA had estimated the prospective real estate taxes of Springfield and Hill at $91,130 and $42,538, whereas by the end of February the petitioners learned that the assessed values of Springfield would be $3,435,000 and for Hill would be $1,570,000 and by May 25 one New York newspaper declared the tax rate would be at least $3.18 which was 12 cents higher than the rate used in the FHA estimates, the final rate being $3.27 and the taxes for Springfield and Hill, $112,324.50 and $51,339, respectively, or an increase for the two of approximately $30,000 over the FHA estimates; that in addition they were incurring or were faced with increases in operating expenses amounting in the aggregate to approximately $51,000 per year which had not been estimated for by the FHA. This $51,000, according to Neisloss, consisted of $10,000 which was the anticipated cost per year for removing trash and garbage for tenants, the free removal of which was discontinued by the City of New York, $10,000 for the redecoration of apartments resulting from the unexpected turnover of tenants, of which there had been about 70 in the first 5 months of 1950, and $31,000 which was an approximation of the cost of furnishing gas and electricity for tenants which it was thought would be required to meet the competition from the other projects. Thus, according to Neisloss, by taking into account the $30,000 for increased real estate taxes and the other

items making up the $51,000 above and allowing $16,000 as the reduction in rents due to vacancies they were faced with an increase of $97,000 in carrying charges which had not been estimated for and the net income of $78,000 which had been estimated by the FHA and upon which they depended would become a deficit of at least $20,000 or $21,000 a year.

At this point let us say that we are not impressed with the representation or suggestion that it was the FHA's estimate of net income that induced the petitioners to enter into the Springfield and Hill ventures. Petitioners were the applicants and based on their own experience they obviously had their own ideas as to operating results to be anticipated and had so indicated on their applications. They were, of course, deeply interested in the FHA estimates of the costs of construction because it was on the basis of those estimates that the amount of obtainable mortgage money was determined. And in that connection note the prompt rejection of the FHA mortgage loan insurance commitments on the first applications. Note also that in their new applications the petitioners in their estimates of income, net after operating expenses and debt service requirements, were still of the opinion that the amounts would not be as great as had been estimated by the FHA on the original applications. Also the petitioners undoubtedly were interested in the rental rates appearing in the FHA estimates of gross income expectancy. But in that connection it is to be noted, as will be pointed out hereafter, that even at the higher rental rates which had been proposed by the petitioners in their applications and the correspondingly higher gross income expectancy, the petitioners' estimates of income, net after operating expenses and debt service requirements, were still substantially less than the net estimated by the FHA using the lower rental rates. It was on such estimates of results of operations that petitioners sought approval of the Springfield and Hill projects.

For a great number of years the petitioners had been engaged in the construction of housing projects and previously had built five projects which similarly had been financed under section 608 of the National Housing Act, two of such projects having been completed as early as 1943, one in 1944, one in 1945, and the fifth in 1948 and apparently under construction when the Springfield and Hill projects were being planned. It was with this background of direct experience that they made application for mortgage loan insurance for the two additional projects and in making such application they sought approval on the basis of their own estimates not only of cost of construction but of gross income expectancy, operating expenses, fixed charges, which included debt service requirements, and the net results therefrom. And if the estimates of construction costs are to be regarded as in-

dicative it would appear that the tendency of both the petitioners and the FHA was definitely quite liberal. Actually the amounts here referred to as estimates of net income were not estimates of net income but as already indicated were estimates of gross receipts, less operating costs including an addition to a "reserve for replacements" and less the amount necessary to cover debt service requirements. And whereas for Springfield the amount, net after operating costs and debt service requirements, as estimated by the FHA, was $53,925 and for Hill $24,916, or $78,841 for both, which latter amount in the round figure of $78,000 is referred to by petitioners as the FHA estimate of annual net income for the two projects, the estimates of the petitioners as shown by their applications, and which patently they regarded as sufficiently attractive to make them desirous of entering upon the ventures even with substantially greater mortgage loan burdens, were $28,361 for Springfield and $16,631 for Hill, or $44,922 for both. Further it is to be noted that such were the estimates of the petitioners even though due to the differences in the rental rates per family unit applied for by petitioners and the rates allowed by the FHA, the gross income expectancy for Springfield as estimated by the FHA was lower by $22,298 than estimated by petitioners and for Hill approximately $7,000. In the case of Hill the FHA estimated for 117 garage spaces and petitioners for only 109.

The evidence does show that by May of 1950, Springfield and Hill were facing some operating costs which had not been estimated for and that some drop in 1950 income to a point below the estimated gross income expectancy was likely, and in that respect the testimony of Neisloss does find support in the facts of record. In amounts, however, his testimony is not supported by the evidence and in one instance the facts show that not only had allowance been made therefor in the estimates of both the FHA and the petitioners, but in each instance the amount which had been estimated was substantially greater than the expenditures actually made by Springfield and Hill therefor.

In estimating the gross income expectancy for Springfield and Hill, both the FHA and petitioners allowed for vacancies of 7 percent. Stipulated facts show that for the first 11 months of 1950 the vacancies in the case of Hill were 15.3 percent and in the case of Springfield 7.9 percent. It was the testimony of Neisloss that the increase in vacancies for Springfield and Hill as a unit was more than 2 percent, and with each 2 percent increase in vacancies the gross income would drop $16,000 which was the amount they allowed for in making their decision to sell. According to the evidence, however, Springfield had rental income of $561,592.02 for the year ended August 31, 1950, or $3,860.02 more than the $557,732 the FHA had estimated and in addi-

tion had other income of $3,893.66 for which no estimates had been made by either the FHA or the petitioners, thereby bringing Springfield's total gross income for the year to $565,485.68. The evidence further shows that for the year ended August 31, 1951, Springfield's rental income was $568,735.98, or $11,003.98 more than the FHA had estimated, and in addition it had other income of $3,987.91 for which no allowance had been made in the estimates, thereby bringing total gross income to $572,723.89, or $14,991.89 more than had been estimated for by the FHA. As to Hill, the evidence is limited to only 1 year of operation with full capacity available, namely the year ended January 31, 1951. For that year its reported rental income was $245,572.50, or $13,093.50 less than the $258,666 as estimated by the FHA. As in the case of Springfield, Hill had other income which had not been estimated for which in the case of Hill was $1,411.39, thereby bringing Hill's actual gross income for the year to an amount $11,682.11 under the FHA estimate. And if the actual experience of Springfield for the year ended August 31, 1950, and that of Hill for the year ended January 31, 1950, be taken as representative of what appeared to be in store for the two projects combined as of May 1950, the drop in their gross income below the FHA estimate was no more than $3,928.43. If on the other hand Springfield's year ended August 31, 1951, be regarded as more nearly indicative of prospects, there was no drop of gross income below the FHA estimates.

As for rubbish and garbage removal, the income tax returns indicate an expenditure of $5,896.85 by Springfield for the year ended August 31, 1950, and by Hill $2,618.26 for the year ended January 31, 1951, which together would indicate an annual expenditure of approximately $8,500. This was an expense which originally had not been estimated for by either the FHA or the petitioners. It was not an expense arising for the first time in early 1950, but one which had regularly been incurred beginning with April 1949 when the City of New York had discontinued such service.

As for the cost of redecorating apartments, the facts show that in the case of Springfield the FHA in its estimate of operating expenses allowed for an annual expense of $22,213 for decorating, of which $16,448 was for tenant space, and that the petitioners in their application had allowed for an annual expenditure of $25,300. In the case of Hill, the FHA had allowed for an annual expense of $10,393 of which $7,695 was for tenant space, and the petitioners in their application had allowed for an annual expenditure of $12,625. In contrast, Springfield's income tax return for the year ended August 31, 1950, indicated an expenditure of only $7,325.58 for all painting and decorating during the year and its return for the year ended August 31, 1951, expenditures of $17,458.01, which was still substantially less

than the $22,213 allowed by the FHA and the $25,300 which had been anticipated by the petitioners. Hill in its income tax return for the year ended January 31, 1951, reported total expenditures for all painting and decorating at $6,423.29 compared with the $10,393 allowed by the FHA in its estimates and the $12,625 which, according to their application for mortgage loan insurance, had been anticipated by the petitioners. On brief the petitioners call attention to the fact that the FHA in making its estimates anticipated the redecorating of each apartment once every 3 years. Possibly this was regarded as bolstering the testimony of Neisloss that the rate of turnover was such as to require substantial decorating expenses which had not been estimated for, in that the amounts shown in the FHA estimates were to be spread over a 3-year period, but whatever petitioners may have had in mind the above estimates of both the FHA and petitioners were estimates of annual expenditures and were not amounts which were to be spread over a 3-year period. As to the rate of turnover actually experienced, the question when directed to Neisloss was objected to on the grounds that the records of Springfield and Hill would be the best evidence and upon such objection the question was withdrawn and no further proof on the point was thereafter offered.

With respect to gas and electricity for tenants, the record does support Neisloss in his testimony that neither the FHA nor the petitioners made any allowance therefor in their estimates of operating expenses. According to Neisloss they realized by May of 1950 that they were faced with that added expense which they estimated would amount to approximately $31,000 annually and at the request of the purchasers of the Springfield and Hill stock they made arrangements for such service. We are not advised when the furnishing of gas and electricity actually began. The contract with the sellers was signed in June. Settlement of certain matters preparatory to closing the sale was made as of August 31, 1950, and actual closing was on November 13, 1950. From the first income tax returns filed, it appears that each project had expenditures for both gas and electricity from the beginning of their operations. For the year ended August 31, 1950, Springfield, according to its return, expended $5,256.34 for electricity and $818.90 for gas. If any part of the amount so expended represented the cost of electricity and gas for tenants, the record does not show. That the expenditures could in part have been for tenants has some support from the fact both the FHA and the petitioners in their estimates indicated all costs for gas were to be borne by the tenants. According to its return for the year ended August 31, 1951, Springfield in that year expended $12,323.57 for electricity and $3,519.27 for gas, or a total for the two of $15,842.84. These expenditures exceeded those of the prior year by $9,767.60 and presumably represented in some

amount expenditures for tenants, but as to how much and whether for a full year or only part of the year, the record is silent. With respect to Hill, the only information of record which would appear to cover a full year of operation after construction had been completed is to be found in its income tax return for the year ended January 31, 1951. According to that return the expenditures were $3,627.52 for electricity and $662.66 for gas. There again we are not advised as to the portion of those amounts which represented the cost of gas and electricity for tenants. But even if it be assumed that the amounts shown as so expended by both Springfield and Hill represented in substantial part, or in full, expenditures for tenants the results would still be substantially short of the $31,000 figure testified to by Neisloss. And not only because of the state of the evidence as indicated but in the light of the undependability of the representations in his testimony as to other items, we are not convinced or persuaded that it should be regarded as accurate or substantially so in this instance.

With respect to real estate taxes the facts do show that at or about the end of February the assessed value of the Springfield and Hill properties were fixed at amounts considerably higher than the FHA had estimated and with the subsequent increase in the tax rate the real estate taxes for the two projects were increased to amounts which in the aggregate were approximately $30,000 more than the FHA had estimated. Actually there is no showing that there ever had been a prior assessment of the completed properties and that the February figures did in fact represent increases in assessments. The facts do show, however, that the petitioners in their applications for mortgage loan insurance had been of the opinion that the assessed values of the projects would be even higher than the amounts at which they were fixed at or about the end of February 1950, and that the resulting real estate taxes would likewise be greater than the taxes actually were after the rate increase in May or June of 1950. In short, the taxpayers in their estimates had made allowance for real estate taxes greater in amount than they were after the 1950 increase.

As demonstrating that there could have been no view to have Springfield and Hill make distributions or to sell the stock thereof until May of 1950, the petitioners on brief summarize as facts shown by the evidence, that they went into the projects as an attractive long-term investment, they expected a good return and planned to accumulate an estate for their families, they did not intend to sell their stock or even consider the possibility of selling it until late May of 1950 when their fears as to the future of the corporations were aroused and "reluctantly" they decided to sell. Aside from the testimony of Neisloss to that effect, we find no evidence of

record which in our opinion would justify or supply the basis for such conclusions of fact. Rather we think the evidence, including the acts of the petitioners themselves, tends to support and establish a contrary conclusion. We can readily agree that the making of distributions would not have been compatible with a purpose to build up Springfield and Hill as an estate for the families of petitioners. And while we find no occasion to discount the existence of a purpose on the part of the petitioners to build estates for their families, we think the course of action followed by them points away from rather than to Springfield and Hill as repositories of such estates.

In evaluating the intentions of the petitioners and the testimony of Neisloss upon which they rely, it is significant, we think, that the petitioners in organizing Springfield and Hill and during the entire period of their ownership, never supplied either corporation with other than token amounts of cash risk capital, namely $30 to each corporation, which amounts would not even cover the expenses of organization. Being thus wholly dependent upon borrowed capital, Springfield was required to begin operations with its properties burdened with a mortgage loan of $4,174,800 which exceeded by $105,856.18 the total cost of the properties as well as legal and organization expenses, fees, interest, and taxes during construction and the like, and similarly Hill began its operations with its properties burdened with a mortgage loan of $1,926,800, which exceeded by $53,965.47 the entire cost of its properties plus other costs as in the case of Springfield. These mortgages were amortizable in monthly installments and Springfield and Hill, having no capital of their own and there being no apparent intent of supplying them with such capital, could build up their equities, other than appreciation, in their operating properties only as each installment was paid. Of the initial installment in each instance approximately 70 percent was absorbed in paying the interest charges on the loans and approximately 30 percent was applicable in satisfaction of principal. With the payment of each installment, however, the portion applicable to principal would increase and the portion required for interest would correspondingly decrease. Such being the situation, it would not have been illogical, to say the least, to expect that the petitioners would not only take steps to see that the projects were operating to their best advantage, but that any and all funds belonging to the corporations would be carefully administered and applied for the full benefit of the corporations if in truth and in fact they did intend to own and hold their stock as a long-term investment so as to accumulate "over a period of time some" estate for their families. The evidence, however, does not show that such was the case.

At the outset the petitioners had obtained options to purchase land for the Springfield and Hill projects, with the options containing a provision for refund of the payments made therefor if the applications to the FHA for mortgage loan insurance should not be approved. In December of 1947, the options were exercised and of the total price paid $81,600 was attributable to the land to be utilized in the Springfield project and $38,400 to the land to be utilized in the Hill project. The purchases, however, were not made for the account of Springfield and Hill, neither was there any subsequent transfer of the land to the corporations as contributions to capital or otherwise. Instead the land was conveyed to the wives of the petitioners and the only estates received by Springfield and Hill in the land they were to develop were 99-year leases for which they were to pay an annual ground rent of $16,188 in the case of Springfield and $7,636 in the case of Hill, to wives of the petitioners. By this course of action Springfield and Hill not only would not be the beneficiaries of the appreciation in the value of the land, which would result from their improvement thereof, but from the beginning and for a period of 99 years were obligated to make fixed annual payments of ground rent in amounts which in slightly more than 5 years would cover the total price just paid for the land. The wives of the petitioners thus acquired valuable estates which, without any of the normal burdens usually attendant upon the ownership of land, assured them of very attractive annual returns in the form of ground rent, the right to which was in no way dependent upon any continued ownership by the petitioners of the Springfield and Hill stock. From its commitments for insurance, it would appear that the FHA was of the opinion that as a result of the construction of Springfield the value of the land occupied by it would be increased from its cost of $81,600 to $404,700 and that of Hill from its cost of $38,400 to $190,900, and these amounts of $404,700 and $190,900 represented the amounts the FHA would be required to pay to the wives of the petitioners if later it became necessary to take over the projects and it was found expedient to acquire the land in fee.

In the case of Springfield the payments under the mortgage bond were to be $19,134.50 monthly and in the case of Hill, $8,831.17 monthly. It was provided that the installments should be applied first to interest at the rate of 4 percent on the principal sum, or so much thereof as should from time to time remain unpaid, with the balance to be applied to principal. By specific provision, there was reserved to Springfield and Hill the privilege "to pay the debt in whole or in an amount equal to one or more monthly payments on principal next due, on the first day of any month prior to maturity upon at least thirty (30) days prior written notice to the holder." By a rider attached it was provided that such prepayment could be made

up to 15 percent of the original face amount of the mortgage without any additional charge. If, however, the prepayment exceeded such 15 percent, additional charges were provided ranging from 4 percent downward as the number of remaining years under the mortgage decreased.

Having received excess mortgage funds of $105,856.18, Springfield by taking advantage of the privilege afforded of prepaying one or more monthly payments on "principal next due," not only could have reduced the principal sum owing under its mortgage but could have relieved itself of the further running of interest on the amount of principal so paid and Hill could have utilized its excess mortgage funds of $53,965.47 to its similar advantage. Patently, Springfield did not require the use of the $105,856.18 in connection with its operations and Hill similarly did not require the use of at least $23,992.89 of its mortgage funds, since very shortly after their receipt from the mortgagee these amounts were paid over or advanced to the N.B. partnership for its use or for the personal use of the petitioners and were never thereafter held or used in any way by Springfield and Hill. The facts further show that by December 13, 1949, Springfield had similarly paid over to the N.B. partnership the further sum of $126,047.37 which apparently represented accumulated rents received and which petitioners must have concluded was not needed or required in the operation of Springfield's business, since those funds were never thereafter paid to Springfield for its use and benefit. Insofar as appears, this sum likewise might well have been applied in prepayment of monthly payments on "principal next due" and thereby have strengthened and built up the equity of Springfield in its operating properties and, by reducing the unpaid principal balance on mortgage loan, relieved Springfield of further interest charges on the principal so prepaid.

In the course of their operations the petitioners freely transferred funds back and forth between their controlled or wholly owned projects, incorporated or otherwise, and there is no indication of formal authorizations for such transfers or written evidences of indebtedness. In short, there was nothing arm's length about any of the transactions, and petitioners, insofar as the shifting of funds was concerned, treated the wholly owned corporations no differently from the N. B. partnership or B. H. B. Associates, which was their joint account and successor to N. B. partnership. They would dip into the till of any one of their corporations for funds to launch a new venture. They would take money from their various ventures for their own personal use and charge it on the books of another, as for instance, the funds drawn from Brookside Gardens and charged as the liability of N. B. partnership on the books of the partnership. They would,

it is true, have appropriate bookkeeping records made to reflect debits and credits but by a further shifting of funds they would clear those accounts in part or in whole if, as, and when they saw fit.

The N. B. partnership took over the contracts for the construction of Springfield and Hill from N. B. Construction Co., Inc., shortly after construction of Springfield, and possibly that of Hill, had been started. And while those contracts provided for the payment of specified sums for construction of the two projects, it is the representation of the petitioners that they were constructed strictly on a reimbursement-of-costs basis. That such was the case receives support from the fact that the partnership returns were filed on that basis and they were accepted and approved by the respondent as filed. The facts also indicate that the building of the shopping center for Oakland Gardens, Inc., was likewise handled on a reimbursement-of-cost basis. There is no showing or claim that the N. B. partnership ever had any funds or capital of its own or that it was intended to have. And in addition to the payments received from Springfield and Hill as construction of those projects progressed, N. B. partnership at various times received funds from the petitioners individually and from various of their other enterprises including Brookside Gardens, Inc., Brookside Builders, Inc., Somerville Gardens, Inc., and Somerset Homes, Inc., in respect of which funds, appropriate entries were made on the partnership books to show the amounts so received as owing by the partnership to the various enterprises, except of course those amounts received from Springfield and Hill which were applied in satisfaction of the charges in respect of the construction of their properties.

When Springfield was approximately 82 percent completed and Hill approximately 72 percent completed the petitioners entered on the construction of the shopping center adjacent to the two projects. For that type of project they did not have access to financing such as that provided through the FHA. The shopping center was in corporate form and was owned and controlled by the petitioners but insofar as appears it had been provided with no capital of its own with which to pay any of the costs of construction and there is no indication that there was ever an intent to supply it with any such capital. It was constructed by the N. B. partnership from a pool of materials which originally had been set up for the construction of the Springfield and Hill projects and its completed cost of $313,213.58 was an allocated amount from a total of $5,878,703.20 which represented the total cost of the Springfield, Hill, and shopping center projects combined.

There was no earmarking of the dollars or any recording of the sources of the funds which were actually applied in satisfaction of the

costs of constructing the shopping center. According to the stipulation of the parties the books of the N. B. partnership show that on December 13, 1949, $227,228.95, being the full amount shown as owing to Brookside Gardens, which amount included approximately $150,000 which Brookside Gardens had advanced to petitioners individually and for which the N. B. partnership had been charged, was paid in full. When that payment was made all advances to the N. B. partnership, as shown by its books, had been fully repaid except for the moneys received from Springfield and Hill and the amounts shown as being the net advances from the petitioners individually. On the next day, December 14, 1949, N. B. partnership, according to its books, received $100,000 back from Brookside Gardens. Also on December 14, 1949, the N. B. partnership received from Oakland Gardens the first payment on the cost it had incurred in constructing the shopping center. The amount of the payment was $8,543.46, leaving $304,670.12 as the balance owing by Oakland Gardens. On January 10, 1950, all amounts standing on the partnership books as owing to petitioners individually were shown as paid in full. The amount paid to Benjamin Neisloss was $183,930.74, the amount paid to Harry Neisloss $169,542.90, and the amount paid to Braunstein $180,748.26. After these payments the only funds shown by the partnership's books as having been received from the petitioners or their various enterprises and still remaining unpaid, consisted of $232,014.41 from Springfield, $23,992.89 from Hill, and $100,000 from Brookside Gardens. Thus, it was only from these funds that on that date the N. B. partnership could account for the $304,670.12 which had been expended in the construction of the shopping center and which was still owing to it from the shopping center. In lieu of payment of the said balance still owing by it to the N. B. partnership, Oakland Gardens at or prior to January 31, 1950, executed in favor of the N. B. partnership or the petitioners an interest-bearing mortgage for $300,000. The balance of $4,670.12 was finally paid to the B.H.B. Associates on March 31, 1951.

Not only do the facts thus show that the petitioners were freely using the surplus funds of Springfield and Hill for their individual purposes which were in no way related to Springfield and Hill or their operations, but since for all practical purposes the funds of Springfield and Hill necessarily accounted in substantial part for the $304,670.12 balance which had been expended in the construction of the shopping center, Springfield and Hill were thus supplying to the petitioners free of charge funds on which the petitioners under the Oakland Gardens mortgage were receiving interest at 6 percent annually, and not only that, but of the funds so provided by Springfield and Hill, Springfield on $105,856.18 and Hill on $23,992.89 were, at their own expense, paying interest at the rate of 4 percent. By way of

contrast, the evidence shows that when repayments were made to Brookside Gardens by Springfield and Hill of moneys they had received shortly after their organization, the amounts when repaid were greater than the amounts shown to have been received, and insofar as appears could have represented the payments of interest by Springfield and Hill.

It requires no effort to understand the willingness of the petitioners to use 4 percent money to earn 6 percent, and particularly so where they are able to use the 4 percent money free of charge. But where, as here, such use of the money was at the expense of Springfield and Hill and had been initiated substantially prior to the completion of the construction of the Springfield and Hill projects, it requires considerably more effort than we have the power to muster to see wherein the fact thereof is a fact compelling the conclusion that ultimate distributions were not attributable to circumstances present at the time of construction but were attributable solely to circumstances which arose after construction. Furthermore, it is, in our opinion, not without significance that after the agreement to sell had been reached and the formal distributions were made, the said distributions by Springfield and Hill to the petitioners could not be made without the kiting of checks between those two corporations and the petitioners' joint account, B.H.B. Associates.

According to Neisloss, the petitioners in entering upon the Springfield and Hill projects were not thinking solely in terms of attractive long-term investments but had in mind benefiting currently to the extent of fees for management services to be rendered the two projects, and the income tax returns do indicate that both Springfield and Hill did pay fees for such services, which presumably were paid to the petitioners. In the case of Springfield, however, the management fees were in addition to office salaries, the salary of the superintendent, and that of the manager of the apartments and garages. The facts further show that in addition to such management fees and salaries, petitioners in each of the years ended August 31, 1949, and August 31, 1950, drew $5,000 each, or a total of $15,000, from Springfield as officers' salaries and similarly drew $2,000 each, or a total of $6,000, from Hill for the year ended January 31, 1950. We are unable to conclude that such salaries to officers were contemplated by the FHA or estimated for by the petitioners. Both the FHA and the petitioners did make estimates for administrative expenses but there was no breakdown and taking into account the expenditures by the two projects for management other than the salaries to petitioners as officers and other normally to be expected items of administration expenses, we are satisfied that the FHA in making its estimates did not contemplate the payment of salaries to officers in addition to the other management costs incurred, whatever may have been in the minds of the petitioners.

In the case of Springfield, the estimate of the FHA for all administrative expenses was $27,887 and the estimate of the petitioners $30,654, whereas for the year ended August 31, 1950, Springfield is shown to have expended $11,355.70 for management fees and $13,006.42 as office salaries and other managerial services, or a total of $24,362.12 before showing any expenditures for other administrative purposes and without including the $15,000 which the petitioners drew as officers' salaries. For the year ended August 31, 1951, during most of which Springfield operated under new owners, the total amount expended for all administrative expenses was $21,660.51, of which $15,744.42 covered all management and office salaries. No amounts were shown as officers' salaries.

After outlining the occurrences in the spring of 1950, which were said to have brought about a "reluctant" decision to sell, it was the testimony of Neisloss, in response to a question on cross-examination, that while every project had its own analysis and every project could not be treated the same, the occurrences in the spring of 1950 leading to the decision to sell "would certainly worry" them "about building another job or doing anything else." It is to be noted, however, that 8 days before the signing of the agreement to sell the Springfield and Hill stock the petitioners had drawn $55,000 from Springfield for the purpose of launching another FHA project, which amount likewise was carried as a loan.

When the pieces of the jigsaw are put in place and the resulting picture is viewed as a whole, we find no real support for the self-serving conclusions outlined by Neisloss in his testimony. To the contrary, the picture, we think, reflects a purpose on the part of petitioners not to look on Springfield and Hill as long-term investments but rather that their purpose and intention was to use them for a quick profit for themselves individually and for their wives a continuing profit which was in no way dependent upon the continued ownership of Springfield and Hill.

On the evidence of record and the facts shown thereby, it is our opinion, and we conclude and hold, that the sale of the stock and the distributions made by Springfield and Hill to their stockholders were attributable to circumstances which were present and had been advisedly created by the petitioners prior to the completion of construction of the two projects and were not attributable solely to circumstances which arose after construction, "other than circumstances which reasonably could be anticipated at the time of * * * construction" and that Springfield and Hill accordingly were collapsible corporations within the meaning of section 117(m).

In the light of the conclusions reached, it becomes unnecessary to pass upon the respondent's alternative contention that the distributions made in August of 1950 constituted compensation under section

22(a). In that connection, however, we could have considerable difficulty with the testimony of Neisloss that it was purely a matter of coincidence that the distribution by Springfield of $13,666⅔ to petitioners for each share of class A common stock held by them was in total amount a distribution of $410,000 and thus within $303 of the builder's and architect's fees included by the FHA in its estimate of cost of construction in arriving at the amount of the insurable loan.

Reviewed by the Court.

*Decisions will be entered for the respondent.*

---

KERN, *J.*, dissenting. I am unable to agree with the conclusions reached by the majority from the evidentiary facts herein, few of which are themselves in dispute.

In my opinion the sale by petitioners of their stock was "attributable solely to circumstances which arose after * * * construction * * * (other than circumstances which reasonably could be anticipated at the time of * * * construction * * *)." I would therefore conclude on the authority of *Charles J. Riley*, 35 T.C. 848, and *Maxwell Temkin*, 35 T.C. 906, that the corporations here involved were not collapsible corporations within the meaning of section 117(m) of the Internal Revenue Code of 1939.